262 P.3d 128 (2011)
In re MARRIAGE OF Lawrence P. FAHEY, Lisa M. Fahey.
No. 40906-2-II.
Court of Appeals of Washington, Division 2.
September 20, 2011.
*130 Patricia S. Novotny, Attorney at Law, Seattle, WA, for Appellant.
Michael D. Howe, Attorney at Law, Omak, WA, for Respondent.
QUINN-BRINTNALL, J.
¶ 1 In this hotly contested child relocation case, Lawrence Fahey challenges the trial court's decision allowing his ex-wife, Lisa Fahey, to relocate their two preteenage daughters from Puyallup, Washington, to Omak, Washington. Lawrence[1] challenges the trial court's order (1) assigning a rebuttable presumption in favor of Lisa's decision to relocate, (2) approving the relocation, (3) restricting his visitation rights under the new parenting plan, and (4) refusing to appoint a guardian ad litem (GAL) to represent the children. He also alleges that the trial court impermissibly considered his disability and gender in making its decisions and asks for a new trial judge on remand. We hold that the trial court did not err when it employed a rebuttable presumption favoring Lisa's authority regarding relocation decisions, approving the children's relocation to Omak, and limiting Lawrence's visitation rights under the new parenting plan. We discern no errors in Lawrence's other appealed issues and we affirm.

FACTS
¶ 2 Lawrence and Lisa were married in 1993. The couple initially lived in Edmonds, near Lawrence's family, and later moved to Pullman so that Lisa could attend Washington State University. After Lisa's graduation, the couple moved to Omak, Lisa's childhood hometown, where she gave birth to their first daughter, Nichole, in June 1998. After Nichole's birth, the family moved back to Edmonds where Lisa gave birth to their second daughter, Shannon, in July 2001. Lisa and Lawrence separated several weeks later and finalized their divorce in May 2002.
¶ 3 In May 2002, the Kitsap County Superior Court entered a permanent parenting plan. Under this plan, both parents had substantial residential time with the children and they had joint decision-making authority for major parenting decisions. No restrictions were placed on either parent for their time with the children. The trial court designated Lisa as the custodial parent and stated that the children "are scheduled to reside the majority of the time with the mother." Ex. 1 at 7. The trial court noted in a miscellaneous plan provision that Lisa "consents to allow [Lawrence] to have access to [the] children up to 50% of the time to the best it can be worked out." Ex. 1 at 12.
¶ 4 Specifically, the original parenting plan provided that until the children began their schooling, "the children shall reside with the mother, except" for Wednesday evening through Friday evening and every first and third weekend of the month; Lawrence also received residential time on any fifth weekends that occurred in a month. Ex. 1 at 2. Once the children began their schooling, the parenting plan provided that Lawrence would "relinquish" his weekday residential time "unless he [could] facilitate school attendance," but that Lawrence could spend time with the children after school on Wednesdays, Thursdays, and Fridays. Ex. 1 at 2. The school summer break residential schedule mimicked the residential schedule followed before the children started their *131 schooling. Generally speaking, all other breaks and holidays were divided equally between Lawrence and Lisa. Throughout the original parenting plan's residential scheduling parts, the trial court consistently framed the children's default residential parent as Lisa, stating, "[T]he children shall reside with the mother, except for the following days and times when the children will reside with or be with the other parent." Ex. at 2-4.
¶ 5 From 2002 through 2009, Lisa moved multiple times and lived at seven different residencies in Kitsap, King, and Pierce Counties.[2] Lawrence continuously resided in one of two homes in Edmonds, Washington.[3]
¶ 6 Partly as a result of Lisa's moves, and partly because of Lawrence's desire for the children to attend private Catholic schools, by the end of the 2008-2009 school year Nichole had attended four different schools through the fifth grade and Shannon had attended different schools for each of her three academic years. Also, when the children began their schooling, Lawrence did not relinquish his weekday visitation rights. Instead, on his visitation days, he facilitated their school attendance by driving them to and from Edmonds and their various Kitsap, Pierce, and King County schools. These commutes lasted several hours each day.
¶ 7 In October 2009, Lisa mailed Lawrence a letter stating her intent to move the children to Omak where she had a new job.[4] On November 4, in Pierce County Superior Court, Lawrence objected to Lisa relocating the children, asked for a temporary restraining order (TRO) to prevent the relocation, and asked the trial court to appoint a GAL for the children. Lawrence and Lisa proposed competing parenting plans to govern if the trial court ultimately approved the Omak relocation.
¶ 8 The trial court held a show cause hearing on December 15, entered a TRO prohibiting Lisa from relocating the children, and refused to appoint a GAL for the children. The trial court's TRO required the children to complete the school year at their current school, allowed Lisa alternating weekend visitation rights, and otherwise left the original parenting plan's terms in effect. Lisa moved to Omak to begin her job and left the children to reside with Lawrence in Edmonds because of the TRO.
¶ 9 On March 30 and April 1, 2010, the trial court held a hearing on the relocation and proposed parenting plan changes. Both Lawrence and Lisa testified at the trial on their perspectives of what was in the children's best interests. They testified that the children had expressed an interest in living in both Edmonds and Omak.
¶ 10 The trial court heard testimony about two accidents that Lawrence experienced earlier in his life. In 1985, Lawrence had a motorcycle accident causing a head injury that put him in a 10-day coma. Lawrence developed epilepsy, which he controls by medication. He did not qualify for Social Security disability, and he was able to continue working. Lawrence's mother testified that Lawrence's epilepsy medication makes it difficult for him to express his thoughts.
¶ 11 In 2001, around the time of Shannon's birth, Lawrence had a work-related accident that shattered the bones in both wrists and permanently altered the functionality of his hands. Since the 2001 accident, Lawrence has been unable to work and receives Social Security disability payments. Between 2006 and 2008, Lawrence provided $33,000 in Social Security support payments for Nichole *132 and Shannon. This money was in addition to paying his court-ordered child support. Since the 2001 accident, Lawrence's parents have provided him with significant financial support, including buying him a house and car, making mortgage payments, and paying litigation expenses related to this case. Lawrence's parents also helped him pay for the children's private school expenses and bought the children clothing.
¶ 12 Lisa testified that she had financial difficulties and a pending lawsuit regarding credit card debt of approximately $775. Frustrated about her financial difficulties, she explained the frequent moves in her life, saying that if she had someone paying for her house, car, and bills that she could have lived in one place her entire life, too. Lisa acknowledged that her current Omak rental agreement would become a month-to-month lease after March 2010, the rental home has been listed for sale, and she might have to move if the house is sold.
¶ 13 At the hearing, Lawrence provided self-prepared charts of the children's residential overnight time with each parent since 2006. The charts indicated that the children slept between 52.05 percent and 56.99 percent of nights at Lawrence's house in 2006, 2007, and 2008. In part, Lawrence had more time with the children in these years because he exercised his right to provide personal care on Lisa's residential days, when she could not, such as during the summer when the children were not in school and attending summer camps. The charts also indicated that the children spent over 50 percent of nights with Lawrence since 2009. This included time imposed under the TRO's restrictions after Lisa moved to Omak. Lisa disputed that Lawrence had the children more than her, but she had not kept detailed records of the time she spent with her daughters and did not produce contrary documentary evidence.
¶ 14 The trial court also heard testimony about the children's extended families in Edmonds and Omak. Lawrence's mother described a large, close-knit Fahey family in the Edmonds area, which includes 10 of Nichole and Shannon's cousins. The trial court admitted a photo album Lawrence's mother created showing the children's activities in Edmonds and events with the Fahey family. Lisa testified about her extended family in Omak and her relationships with her family. She stated that photos showing the children's connections to her family had been "left [ ] in the [courthouse] restroom" on the first day of trial and they were never found. 2 Report of Proceedings (RP) at 253. Several of Lisa's family members attended the trial but none testified.
¶ 15 The trial court heard testimony from some of the children's school teachers. They described frequent contact with Lawrence and minimal contact with Lisa, though some teachers acknowledged they knew Lisa worked full-time and that Lawrence could not work due to his disability. One of Shannon's teachers testified that Shannon spontaneously told her that she did not want to move.[5] One of Nichole's teachers testified that Nichole wrote, "Please don't tell anybody, but I want to live with my dad" on a class handout when responding to a question about secrets. 2 RP at 125. In addition, Lawrence provided the trial court with (1) demographics and public health and safety statistics for comparing the City of Edmonds and Okanogan County, and (2) characteristics of the Omak School District and a private Catholic high school in Seattle.
¶ 16 Joy Hitztaler, the children's psychologist since January 2010, testified at the hearing. Hitztaler relayed that Shannon stated that she wants to live with both her mom and dad and that she does not want to leave her friends and school in Edmonds. Hitztaler stated that Nichole seemed to have closer relationships with Lawrence's family than with Lisa's family and that she told Hitztaler that "she would want to live with her dad like she does now and do the weekends like they have been doing with her mom." 2 RP at 165. In Hitztaler's opinion, the best course of action for the children was to allow them to reside in Edmonds because of their familiarity with the area and their already developed friendships.
*133 ¶ 17 On April 23, the trial court issued a letter ruling. The trial court began by stating its belief that Lisa "was intended to be the primary parent in the parties' parenting plan." Clerk's Papers (CP) at 28. The trial court then determined that, based on the statutory factors in RCW 26.09.520, Lawrence had not overcome the rebuttable presumption that permitted Lisa, the parent "with whom the child resides a majority of the time," to relocate the children. RCW 26.09.430.[6] The trial court ruled that the best interests for both children were to have Lisa as their primary parent and approved the relocation to Omak.
¶ 18 Lawrence filed a motion for reconsideration, again requested the appointment of a GAL, and asked for the trial court to stay its decision. Lawrence filed declarations from the children's school teachers and Hitztaler supporting his reconsideration motion. Shannon's teacher stated that Shannon told her "that she did not want to move to Omak" and that Nichole's teacher noticed a change in her demeanor and academic performance in the weeks following the trial court's decision. CP at 58. Hitztaler declared that the girls cried on the night they learned of the trial court's decision and that the girls stated they did not want to move, "avoid[ed] thinking about [the move] in hopes that it will not happen," "express[ed] hope that the order is changed, and they are able to stay with their dad," and had not spoken with Lisa since the trial. CP at 63-64. Hitztaler stated that, in her opinion, the children's best interests would be served by living primarily with Lawrence.
¶ 19 On June 4, the trial court entered its final order denying Lawrence's objection to Lisa's relocation. The trial court also denied Lawrence's motions for reconsideration, for the appointment of a GAL, and for a stay of its decision. Finally, the trial court entered a new parenting plan that reduced Lawrence's residential time when compared to the original parenting plan. In particular, the trial court granted Lawrence (1) two weekend visits a month, but required that these visits take place in Omak; and (2) visitation rights every three-day weekend in the year, but again required that these visits take place "around Omak but [Lawrence] may travel short distances including Chelan." CP at 82. Lawrence's other school vacation break/holiday residential time rights where not geographically limited. The trial court again designated Lisa as the primary residential and custodial parent of both children, but it assigned joint decision-making authority for major decisions.
¶ 20 Lawrence timely appealed the June 4 parenting plan order; the final order approving of the relocation; and the denial of his motions for reconsideration, GAL appointment, and a stay. In August 2010, Lawrence requested that we stay the trial court's order permitting the relocation until we completed our review. We denied the motion because the relocation had already occurred but agreed to accelerate our review of the case.

ANALYSIS
¶ 21 As a threshold matter, Lisa argues that Lawrence cannot appeal the trial court's June 4 orders because Lawrence's attorney's signature "approv[ing the orders] for entry" constitutes a judgment by consent that binds the parties. Br. of Resp't at 7. Lawrence responds that his attorney's signature merely served to allow for the orders' entry in lieu of a notice for presentation per CR 54(f).[7] We agree with Lawrence that he can appeal the trial court's orders.
*134 ¶ 22 Lawrence's attorney's signature on the trial court's order did not equate to Lawrence's agreement with the terms of the trial court's decisions and orders. Lawrence's attorney did not waive Lawrence's right to appeal by approving for entry the orders in lieu of a notice for presentation. See Harter v. King County, 11 Wash.2d 583, 589-90, 119 P.2d 919 (1941); see also In re Marriage of Maxfield, 47 Wash.App. 699, 707 n. 2, 737 P.2d 671 (1987) (stating that an attorney's refusal to sign a contempt order and judgment "would not affect the authority of the court to enter its order and judgment.").
¶ 23 In addition, there was no stipulation by the parties or an agreement on the resolution of the issues in this case for the trial court to embody in its orders and, therefore, the orders cannot be considered judgments by consent. See Wash. Asphalt Co. v. Harold Kaeser Co., 51 Wash.2d 89, 91, 316 P.2d 126 (1957); Smyth Worldwide Movers, Inc. v. Whitney, 6 Wash.App. 176, 179, 491 P.2d 1356 (1971). Lisa argues that the parties entered into a consent agreement at the June 4, 2010 hearing by advising the trial court on language to help it achieve its stated goals during its oral rulings. We reject this proposition. The trial court had already made clear its rulings in favor of Lisa and against Lawrence. Lawrence's attorney helped the trial court develop appropriate language to draft an order reflecting the trial court's decision, but this does not constitute acquiescing or stipulating to the substance of that ruling.
¶ 24 Here, the issues were vehemently litigated, the parties presented diametrically opposed solutions, and Lawrence filed a timely motion for reconsideration that the trial court denied. Accordingly, the trial court's orders cannot be characterized as a consent decree and he can appeal the trial court's June 4, 2010 orders.

The Child Relocation Statutes
¶ 25 Lawrence asserts that the trial court abused its discretion by incorrectly applying a rebuttable presumption in favor of allowing Lisa, as the primary residential parent, to relocate the children. Lawrence contends that the rebuttable presumption applies only when there is a "principal residence" and the parent seeking the relocation is the one "`whom the child resides a majority of the time.'" Br. of App. at 30 (quoting RCW 26.09.410 and .430). Lawrence argues that because, as a matter of fact, Nichole and Shannon resided with him a majority of the time since 2006, that Lisa cannot invoke the relocation statutes and is not entitled to the rebuttable presumption favoring her relocation decision. Lawrence believes that the trial court should have used the parenting plan modification statute, RCW 26.09.260, instead of the relocation statutes, RCW 26.09.405-.560. Lisa responds that Lawrence's arguments cannot be made for the first time on appeal. Lisa also argues that as the primary residential parent under the original parenting plan, she may invoke the relocation statute and its rebuttable presumption in favor of her decision.
¶ 26 As an initial matter, Lisa incorrectly claims that Lawrence raises concerns about the applicability of the relocation statutes and the rebuttable presumption, for the first time on appeal. Lawrence presented arguments about these issues in his April 1, 2010 brief to the trial court under the heading, "There should be no Presumption in favor of Relocation," before he analyzed the relocation factors as an alternative argument. CP at 150. Accordingly, we address Lawrence's arguments about the applicability of the child relocation statutes.
¶ 27 We review errors of law to determine the correct legal standard de novo. In re Marriage of Kinnan, 131 Wash.App. 738, 751, 129 P.3d 807 (2006). We review challenges to a trial court's factual findings for substantial evidence. In re Marriage of McDole, 122 Wash.2d 604, 610, 859 P.2d 1239 (1993). We uphold trial court findings that are supported by substantial evidence. McDole, 122 Wash.2d at 610, 859 P.2d 1239. Substantial evidence exists if the record contains evidence of a sufficient quantity to persuade *135 a fair-minded, rational person of the truth of the declared premise. In re Marriage of Griswold, 112 Wash.App. 333, 339, 48 P.3d 1018 (2002), review denied, 148 Wash.2d 1023, 66 P.3d 637 (2003). We review conclusions of law to determine whether factual findings that are supported by substantial evidence in turn support the conclusions. In re Marriage of Myers, 123 Wash. App. 889, 893, 99 P.3d 398 (2004). Within the confines of these standards, the trial court has discretion to grant or deny a relocation after considering the RCW 26.09.520 relocation factors and the interests of the children and their parents. In re Marriage of Horner, 151 Wash.2d 884, 893-94, 93 P.3d 124 (2004); Bay v. Jensen, 147 Wash.App. 641, 651, 196 P.3d 753 (2008). We defer to the trial court's ultimate relocation ruling unless it is manifestly unreasonable or based on untenable grounds or untenable reasons under the abuse of discretion standard. Horner, 151 Wash.2d at 893, 93 P.3d 124; Bay, 147 Wash.App. at 651, 196 P.3d 753.
¶ 28 Washington's child relocation act is codified at RCW 26.09.405-.560. The act imposes notice requirements and sets standards for relocating children who are the subject of court orders regarding residential time. In re Custody of Osborne, 119 Wash.App. 133, 140, 79 P.3d 465 (2003). "Relocate" under the act means "a change in principal residence either permanently or for a protracted period of time." RCW 26.09.410(2).
¶ 29 A person "with whom [a] child resides a majority of the time" must provide notice of an intended relocation to every person entitled to residential time with the child. RCW 26.09.430. If a person entitled to residential time objects, the person seeking to relocate the child may not do so without a court order. RCW 26.09.480(2). A trial court must conduct a fact-finding hearing, at which the relocating parent benefits from a rebuttable presumption that the relocation will be allowed. RCW 26.09.520. The objecting person may rebut the presumption by a showing that, with regard to the child and relocating person, the detrimental effects of relocating outweigh the benefits. RCW 26.09.520.[8] After the hearing, the trial court has the authority "to allow or not allow a person to relocate the child" based on an overall consideration of the best interests of the child. RCW 26.09.420; In re Parentage of R.F.R., 122 Wash.App. 324, 328, 93 P.3d 951 (2004); In re Marriage of Grigsby, 112 Wash.App. 1, 7-8, 57 P.3d 1166 (2002).
¶ 30 If there is no parenting plan, whether a party is "a person with whom the child resides a majority of the time" under RCW 26.09.430 is a question of fact. R.F.R., 122 Wash.App. at 330, 93 P.3d 951 (absent a parenting plan, evidence supported trial court's findings that mother was entitled to presumption in favor of relocation). The R.F.R. court noted that when a parenting plan is in place, "the parent who is entitled to the presumption of relocation under RCW *136 26.09.430 is more easily determined." 122 Wash.App. at 330, 93 P.3d 951. In R.F.R., however, there was no parenting plan in place. 122 Wash.App. at 330, 93 P.3d 951.
¶ 31 Here, the trial court reviewed the permanent parenting plan, entered in Kitsap County Superior Court in 2002, to identify the primary residential parent. The 2002 parenting plan stated, "The children named in this parenting plan are scheduled to reside the majority of the time with the mother." Ex. 1 at 7. Also, each of the parenting plan's residential scheduling sections contained language designating Lisa as the primary residential parent. Ex. 1 at 2-4 (Stating that "the children shall reside with the mother, except for the following days and times when the children will reside with or be with the other parent.") (emphasis added). Based on these portions of the parenting plan, substantial evidence supports the trial court's finding that the 2002 parenting plan established Lisa as the primary residential parent.[9] And because the trial court determined that Lisa was the primary residential parent, it properly applied the child relocation statutes and the rebuttable presumption favoring her relocation decision.
¶ 32 We note that, by the plain language of the child relocation statutes, the notice requirements are triggered by the intended relocation of a person "with whom the child resides a majority of the time." RCW 26.09.430. This plain language suggests that if neither parent qualifies as a parent with whom a child resides a majority of the time, for example when residential time is split 50/50, that neither parent can invoke the child relocation statute and receive the rebuttable presumption in his/her favor. Lawrence's arguments highlight the absence of statutory guidance in 50/50 residential time situations when he argues that the original parenting plan in this case intended that he and Lisa share residential time equally. But Lawrence's arguments are not persuasive because the original parenting plan designated Lisa as the primary residential parent.
¶ 33 Although the original parenting plan envisioned approximately equal residential time for Lawrence and Lisa, it granted Lisa more residential time and expressly identified her as the primary residential parent. Under the standard weekly residential schedule, the children spent three weekdays with Lisa compared to two weekdays with Lawrence. Ex. 1 at 2 ("If a fifth weekend occurs in the month, [Lawrence] shall have [the] children to compensate for the uneven distribution of weekdays[,] ([Lisa] 3, [Lawrence] 2) and for the greater disparity when the children start grade school."). (Emphasis added.) In addition, the original parenting plan stated that the "children named in this parenting plan are scheduled to reside the majority of the time with the mother." Ex. 1. at 7 (emphasis added). Moreover, although the original trial court acknowledged in the parenting plan that Lisa consented to allowing Lawrence access to Nichole and Shannon up to 50 percent of the time, the original trial court stated that his access should be allowed only "to the best it can be worked out." Ex. 1 at 12. Accordingly, the record does not support Lawrence's contention that the original parenting plan did not designate Lisa as the children's primary residential parent.
¶ 34 Next, Lawrence argues that, even if the original parenting plan designated Lisa as the primary residential parent, in practice he has been the children's actual primary residential parent since 2006. Lawrence argues that because the children spent more than 50 percent of nights sleeping in his home since 2006, the trial court should not have considered Lisa the primary residential parent. But Lawrence cites no authority for the proposition that actual residential circumstances negate the express intent of a primary residential parent designation in a permanent parenting plan. We do not address arguments that are not supported *137 by cited authorities. RAP 10.3(a)(6); In re Marriage of Fiorito, 112 Wash.App. 657, 669, 50 P.3d 298 (2002). And, contrary to Lawrence's position, the parenting plan in place at the time of a proposed relocation is used to determine primary residential parenting status. See R.F.R., 122 Wash.App. at 330, 93 P.3d 951.
¶ 35 Even if Lawrence actually had a majority of the residential time with the children from 2006 until the relocation, the circumstances of his residential time did not warrant a per se negation of Lisa's primary residential parenting designation in the original parenting plan. Lawrence's residential time charts indicate that he enjoyed a significant amount of residential time, compared to Lisa's time, with the children during the summer months. Under the original parenting plan, each parent had the right to provide personal care for the children when the other parent was unavailable during his or her residential time. During the summer months when the children were not in school, and Lawrence was not employed but Lisa was employed, Lawrence consistently exercised his right to care for the children rather than put them in day care when Lisa worked. But just because Lisa was unavailable to personally care for the children on each and every day of her scheduled residential time when she worked did not extinguish her primary residential parenting status under the parenting plan. Moreover, the record suggests that during some of Lawrence's summer residential time, Nichole and Shannon were primarily at summer camp rather than with him all day.
¶ 36 In addition, Lawrence's charts indicate that beginning in late 2009, the children resided with him virtually full time. But this full-time residential status with Lawrence resulted from the TRO requiring that the children remain in Western Washington, when Lisa began her new job in Omak, pending the outcome of a full relocation hearing.
¶ 37 Accordingly, under the facts of this case, the trial court's finding that Lisa is the children's primary residential parent is supported by substantial evidence. The trial court correctly applied the rebuttable presumption in favor of Lisa's decision to relocate the children to Omak. We next turn to the trial court's analysis of the statutory relocation factors and authorization of the relocation.

Analysis of the Relocation Factors
¶ 38 Generally speaking, Lawrence argues that the trial court ignored evidence favorable to him when evaluating the child relocation factors in RCW 26.09.520. Lisa does not specifically respond to these arguments. Based on our review of the trial court's analysis of the relocation factors, the trial court did not base its decision approving of the relocation on untenable grounds or untenable reasons.
¶ 39 We review a trial court's decision regarding the relocation of children for a manifest abuse of discretion. Horner, 151 Wash.2d at 893, 93 P.3d 124; Bay, 147 Wash. App. at 651, 196 P.3d 753. A trial court manifestly abuses its discretion when our review of the record shows that its decision is based on untenable grounds or untenable reasons. In re Marriage of Littlefield, 133 Wash.2d 39, 46-47, 940 P.2d 1362 (1997).
¶ 40 First, to the extent Lawrence's arguments rely on his assertion that the original parenting plan intended for 50/50 residential time, we have already upheld the trial court's finding that the original parenting plan designated Lisa as the primary residential parent. Accordingly, we do not consider further arguments rooted in contrary interpretations of residential parenting status under the original parenting plan; specifically, Lawrence's arguments relating to the trial court's analysis of child relocation factors RCW 26.09.520(2) and (3).
¶ 41 Second, contrary to Lawrence's assertions, the trial court considered much of the evidence that he insists it ignored. For example, Lawrence states that "the court ignored the depth and breadth of the children's relationship with the extended Fahey family and ignored the lack of relationships with Lisa's family in Omak." Br. of Appellant at 43. But the trial court stated in its analysis that "[t]he girls are bonded to and care about their grandmother and extended family. The court sees no reason for that to change *138 in nature with the relocation, although quantity of time may be more limited." CP at 28. Moreover, RCW 26.09.520(1) requires the trial court to consider the strength and quality of the children's relationship with "each parent, siblings, and other significant persons in the child's life." (Emphasis added.) The statute does not require a consideration of the absence of nonimmediate family member relationships (i.e., the alleged lack of relationships between the children and Lisa's family in Omak).
¶ 42 Third, Lawrence incorrectly claims that the trial court was required to consider the impact of prior relocations to fully analyze relocation factor RCW 26.09.520(6). RCW 26.09.520(6) requires the trial court to evaluate "the likely impact the relocation or its prevention will have on the [child]." (Emphasis added.) This factor requires a consideration of the potential impacts surrounding the present pending relocation and does not require a review of prior relocations.
¶ 43 Fourth, Lawrence's other relocation factor challenges are best characterized as arguments about the trial court's credibility determinations and the weight that it placed on the evidence. But we do not review credibility determinations or weigh evidence on appeal. In re Marriage of Meredith, 148 Wash.App. 887, 891 n. 1, 201 P.3d 1056, review denied, 167 Wash.2d 1002, 220 P.3d 207 (2009). Discounting the demographic information comparing Edmonds and Omak based on perceived flaws in the data; minimizing the influence of Lawrence's asserted reasons for Lisa's previous moves; finding that Lisa's reasons for relocating the children to Omak are "sound and in good faith"; and believing Lisa's claim that moving to Omak financially benefits her, are decisions that we cannot review. CP at 29.
¶ 44 Last, we note that the trial court evaluated this case applying the correct context to its best interest of the child analysis. Although the trial court considered the influence and impact that Lawrence's extended family, in particular his parents, and Lisa's extended family could have on Nichole's and Shannon's upbringing, the trial court correctly declined to overemphasize these considerations and rested its decision on an evaluation of the children's parents: Lisa and Lawrence. Importantly, Lawrencenot his parentsfiled the relocation objections and motions in this case. Accordingly, third-party visitation right legal principles, under Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and nonparental custody statutes, ch. 26.10 RCW, are not implicated.
¶ 45 The trial court correctly applied the rebuttable presumption in favor of the primary residential parent's, here Lisa's, relocation decision and the trial court did not approve of the relocation based on untenable grounds or untenable reasons. Accordingly, the record shows that the trial court's order denying Lawrence's objection to the relocation must be affirmed.

Consideration of Lawrence's Disability and Gender
¶ 46 Lawrence next contends that the trial court improperly considered his disability and gender when approving the relocation. We discern no error.
¶ 47 We review a trial court's decision regarding the relocation of children for an abuse of discretion. Horner, 151 Wash.2d at 893, 93 P.3d 124; Bay, 147 Wash.App. at 651, 196 P.3d 753. A trial court manifestly abuses its discretion when our review of the record shows that its decision is based on untenable grounds or untenable reasons. Littlefield, 133 Wash.2d at 46-47, 940 P.2d 1362.

A. Consideration of Disability
¶ 48 Here, when analyzing the relocation factors, the trial court considered Lawrence's executive functioning capacity. But the trial court's consideration of Lawrence's disability on his ability to provide for his children does not constitute per se illegal discrimination or bias. The trial court's evaluation of Lawrence's disability was only part of the consideration of one of the unweighted relocation factors in determining the approval of the relocation.
¶ 49 Relocation factor RCW 26.09.520(6) suggests that the trial court is required to *139 review the parenting abilities of each parent. RCW 26.09.520(6) requires the trial court to consider the "age, developmental stage, and needs of the child." Implicit to relocation factor RCW 26.09.520(6) is an analysis of each parent's ability to parent and care for his/her children based on their age, developmental stage, and needs in each of the new and current geographic settings. When discussing relocation factor RCW 26.09.520(6), the trial court expressed concerns about
[Lawrence's] ability to provide for the girls' needs at this stage of life given his short term memory issues and his lack of executive function capability. [Lawrence's] story was told through his articulate mother, who together with her husband has provided the private schooling and other benefits for the children and assisted [Lawrence]. [Lawrence's] own testimony did not give the court confidence of his parenting capacity with preteens testing the boundaries of behavior and exploring their own identities, should primary custody be changed to him.
CP at 29. The trial court explained that it considered the impact Lawrence's disability had on his ability to provide for his children's needs. Based on relocation factor RCW 26.09.520(6), the trial court did not inappropriately consider Lawrence's disability in its overall analysis.
¶ 50 Moreover, the trial court made an extremely detailed record of its evaluation of each of the relocation factors. On this record, based on the trial court's overall analysis of the case, we cannot say that the trial court discriminated against Lawrence because of his disability.
¶ 51 To the extent Lawrence argues that no evidence supports that his disability could impact his parenting ability, we disagree. Lawrence's mother testified that he had "problems with executive functioning" and that his epilepsy medication impacts his ability to express his thoughts. 2 RP at 141.
¶ 52 Moreover, the trial court's rulings state that its decision is rooted in its own evaluation of Lawrence's trial testimony. During Lawrence's trial testimony, the trial court had to repeatedly interject and refocus Lawrence's narrative responses because they frequently did not relate to the questions asked. Also, during his testimony, Lawrence often had to request counsel to repeat questions. As an appellate court, we are not entitled to weigh evidence or the credibility of witnesses that a trial court has determined in part by its observations of a witness's demeanor. In re Sego, 82 Wash.2d 736, 739-40, 513 P.2d 831 (1973).

B. Consideration of Gender
¶ 53 Lawrence's claims that the trial court impermissibly made its decisions based on his gender are not supported by the record. First, Lawrence's references to the record are not to the trial court's written or oral rulings but instead to Lisa's trial testimony where she said,
I also worry about just the fact that they're girls and they think they should be with their mom.
. . . .
... I mean just one of the things would be all the female stuff like getting them bras and when they start their period. No girl that I've ever known would ever want to talk to their dad about that, myself included. It's just not somethingI mean that's something you talk to your mom about.
2 RP at 240. But that the trial court heard this testimony does not mean that it made its decision for impermissible, gender-based reasons.
¶ 54 Second, Lawrence's assertion that the trial court's repeated emphasis of Nichole's and Shannon's gender made "clear its view that the father, by virtue of his sex, was not in the running to be the primary residential parent," exaggerates and misrepresents the trial court's reasons for its decision. Br. of Appellant at 35. The trial court did state in its decision that "the pre-teen ages of the girls, their transition from elementary school to high school and the testing of boundaries and exploration of identities likely to come, make this a crucial time in the children's lives." CP at 29. But contrary to Lawrence's claim that the trial court went on to imply that this is a "time when they need their Mother more than their Father," the *140 trial court then discussed its assessment of each parent's ability to meet the children's needs during this point in their lives. Reply Br. of Appellant at 17. Accordingly, the trial court's reasons for its decision reveal that it did not deny Lawrence's objection to the relocation because of his gender.

Time and Geographic Restrictions in the New Parenting Plan
¶ 55 Next, Lawrence assigns error to the trial court's limitations on his residential time under the new, post-relocation parenting plan. In particular, he asserts that the trial court abused its discretion when limiting the location of his weekend visitations to the Omak area. Because the trial court explained its restrictions with reasons that are not untenable, we affirm.
¶ 56 We review a trial court's decisions regarding the relocation of children or the modification of a parenting plan for an abuse of discretion. Horner, 151 Wash.2d at 893, 93 P.3d 124; Bay, 147 Wash.App. at 651, 196 P.3d 753; In Re Custody of Halls, 126 Wash. App. 599, 606, 109 P.3d 15 (2005). A trial court manifestly abuses its discretion when our review of the record shows that its decision is based on untenable grounds or untenable reasons. Littlefield, 133 Wash.2d at 46-47, 940 P.2d 1362.
¶ 57 Contrary to Lawrence's assertions, the trial court explained its reasons for the geographic limitations on his visitation rights in the new parenting plan, albeit more clearly in its oral ruling than in its written rulings. In its April 23, 2010 letter, the trial court stated, "[Lawrence's] reasons for opposing the relocation are not bad faith reasons, but the court finds that [Lawrence] does not properly account for and weigh his daughters' needs. This is demonstrated in his long term commuting with them." CP at 29. During its oral ruling on June 4, 2010, when entering final orders, the trial court explained its reasons for the geographic restrictions on Lawrence's weekend visitation rights stating,
Because the Court is concerned with two pre-teen and teenage girls spending their lives in cars, being transferred to one place and another place as opposed to participating in normal activities that they may have with their friends in Omak, despite the fact that it is their father's weekend.
. . . .
... I do not want to be overly restrictive. I think the parents could work this out with mutual agreements. But I'm afraid, given [Lawrence's] previous history, that he will take them to Edmonds, regardless of the children's desire or regardless of how much time they're just spending in the car. That seems to have been the history of this case, that they went long distances just to be in Edmonds, and I didn't alwaysI mean, I know there were activities, and when they're in elementary school, I don't think children have the kind of social networks that they do as they become older that are important for them to maintain and have.
So if you can reword that to encompass my meaning, I'm happy to approve that. I want every weekend visit to be focused on the best interest of the girls.
RP (June 4, 2010) at 22-23.
¶ 58 The trial court did not impose geographic limitations on Lawrence's visitation for untenable reasons. The trial court observed that for several years Nichole and Shannon spent multiple hours in a car several days a week when Lawrence "facilitate[d their] school attendance" from Edmonds to South Puget Sound schools, and it expressed concern about this pattern of spending hours in a car continuing because of Lawrence's wishes rather than based on Nichole's and Shannon's best interests. Ex. 1 at 2. Under RCW 26.09.191(3)(g), parental visitation rights can be restricted based on any "other factor[ ] or conduct [that] the court expressly finds adverse to the best interests of the child." We note that the trial court expressly allowed for weekend visitations to occur in nearby Chelan, where the Fahey family happens to have residential housing. Moreover, no geographic limitations were imposed for Lawrence's visitations that exceed three days and the trial court noted in its oral ruling that it hoped weekends involving special occasions, *141 such as a wedding, could be worked out for the children to go Edmonds.[10]
¶ 59 As for Lawrence's concerns that his residential time is now only "27% ... of the time" compared to the asserted previous 50/50 residential time split, we discern no error. Br. of Appellant at 41. Relocations involve new time and distance factors that will inevitably require dramatic changes to a parenting plan. It appears that Lawrence is primarily concerned that the trial court granted the relocation and adopted, for the most part, Lisa's proposed parenting plan. But if the trial court had denied the relocation, it likely would have substantially adopted Lawrence's proposed parenting plan, which would have limited Lisa's residential time in ways similar to those imposed on Lawrence in the new parenting plan. A trial court decision is not based on untenable grounds simply because it favors one parent against another.

GAL Appointment
¶ 60 Last, Lawrence challenges the trial court's denial of his requests to appoint a GAL and asks that we remand and direct the trial court to appoint a GAL. Lisa argues that Lawrence only properly appealed the trial court's denial of his last GAL appointment request, which he made as part of his motion for reconsideration, and that the appointment of a GAL was not necessary at that time.
¶ 61 Lawrence did not seek interlocutory review of the trial court's decisions denying an appointment of a GAL during the initial stages of the proceedings below. Accordingly, we review only the June 4, 2010 order refusing to appoint a GAL. The trial court made this decision at the same time that it denied Lawrence's motion for reconsideration. In light of our analysis that the trial court's findings are supported by substantial evidence and that it correctly applied the law when making its rulings, the trial court also did not err by denying the appointment of a GAL after it declined to reconsider these rulings. After the resolution of the case and the entry of final orders, there was no impact a GAL could have on the trial court's decision.

Conclusion
¶ 62 Our opinion resolves the issues in this appeal by holding that the trial court did not err when ruling that Lisa was Nichole and Shannon's primary residential parent under the 2002 permanent parenting plan, applying the child relocation statutes, applying the rebuttable presumption in favor of Lisa's relocation decision, and approving the children's relocation to Omak. We also hold that, under the facts of this case, the trial court did not discriminate against Lawrence based on his disability or gender. Finally, we hold that the trial court's decisions to impose limitations on Lawrence's visitation rights under the new parenting plan and to deny the appointment of a GAL after entering its final orders were not based on untenable grounds. We affirm.[11]
I concur: PENOYAR, C.J.
ARMSTRONG, J. (dissenting).
¶ 63 Lisa Fahey changed residences eight times between the parties' separation in 2001 and 2009 before she announced her intent to make a ninth move with the childrenthis time to Omak. These residential changes were at least part of the reason Nichole changed schools five times through the sixth grade and Shannon changed schools three times through the third grade. Yet, in spite of this unsettled atmosphere, evidence that the children spent a majority of their time with Lawrence, and testimony the children did not want to move, the trial court granted Lisa permission to relocate to Omak. I dissent because in granting Lisa's requested *142 relocation, the trial court misapplied the relocation statute.

I. Rebuttable Presumption
¶ 64 Washington's Child Relocation Act, codified as RCW 26.09.405-.560, requires a person "with whom [a] child resides a majority of the time" to provide notice that he or she intends to relocate. RCW 26.09.430; In re Custody of Osborne, 119 Wash.App. 133, 140, 79 P.3d 465 (2003). If an interested person objects to the relocation, the person seeking to relocate may not do so without a court order. RCW 26.09.480(2). Upon such an objection, the superior court must conduct a hearing to determine whether the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person. RCW 26.09.520. At that hearing, the relocating parent is entitled to a rebuttable presumption that the relocation will be allowed. In re Parentage of R.F.R., 122 Wash.App. 324, 328, 93 P.3d 951 (2004).
¶ 65 The trial court applied the presumption in Lisa's favor after finding that the girls resided with her a majority of the time. The majority finds substantial evidence to support this finding, but I find none and would hold that the trial court erred as a matter of law in applying the relocation presumption in Lisa's favor.
¶ 66 Whether a parent has the children for a majority of the time is a factual question. See Parentage of R.F.R., 122 Wash.App. at 330, 93 P.3d 951. A parenting plan may make it easier for the court to determine whether a parent is entitled to the presumption of relocation under RCW 26.09.430. Parentage of R.F.R., 122 Wash.App. at 330, 93 P.3d 951. But the wording of a parenting plan is not, as the majority contends, the deciding factor. By looking solely at the parenting plan in affirming the trial court's finding that Lisa was the primary residential parent, the majority relies on dicta from a case in which there was no parenting plan. Parentage of R.F.R., 122 Wash.App. at 330, 93 P.3d 951. In Parentage of R.F.R., 122 Wash.App. at 330, 93 P.3d 951, we merely noted that it would have been easier to determine which parent was entitled to the relocation presumption had a plan existed.
¶ 67 No case has held that the wording of a parenting plan controls over the reality of where the children reside a majority of the time. And the statute is clear that the presumption works in favor of the parent "with whom the child resides a majority of the time," not the parent with whom the child is scheduled to reside a majority of the time. RCW 26.09.430 (emphasis added). If the trial court and the majority are correct, a parenting plan's designation of the primary residential parent would control even if the children actually spent 90 percent of their time with the nondesignated parent. Yet, the legislature has clearly stated its goal of maintaining residential continuity in the children's lives. RCW 26.09.002; In re Marriage of Combs, 105 Wash.App. 168, 174, 19 P.3d 469 (2001).
¶ 68 Moreover, even if the parenting plan's wording controls, the language here is ambiguous as to how the parties intended to share the girls' time. It states that "the children named in this parenting plan are scheduled to reside the majority of the time with the mother." Ex. 1, at 3.12. But the parties were required to designate a primary custodial parent for the purposes of other state and federal statutes. See RCW 26.09.285.[12] And the parties agreed that the primary custodial parent designation "shall not affect either parent's rights and responsibilities under the parenting plan." RCW 26.09.285; Ex. 1, at 3.12. These "rights and responsibilities" specifically included sharing residential time as equally as possible. Ex. 1, at 3.1-.9. Lawrence was given the last weekend of five-weekend months to compensate for the unequal distribution of weekdays, *143 and Lisa allowed Lawrence "access to [the] children up to 50% of the time to the best it can be worked out." Ex. 1. Contrary to the majority's interpretation, the parenting plan demonstrates that Lisa and Lawrence intended to share the children's time equally. More importantly, the record shows that from 2006 to 2010, the children spent a majority of their time with Lawrence. Lawrence's charts document that the children slept at his home between 52.05 percent and 56.99 percent of nights from 2006 through October 2009.[13] Lisa disputed that Lawrence had the children more than she did, but she produced no records supporting her claim. She said that she had the children a "little bit more" during the school year, but she acknowledged that she had the girls only on alternating weekends when they attended summer camp. Clerk's Papers (CP), Attach. at 129-31. The evidence does not show that Lisa was the primary custodial parent, and the trial court erred in applying the relocation statute's presumption in favor of her proposed move to Omak.
¶ 69 Because the relocation statute's presumption does not apply, the trial court essentially enacted a new parenting plan in accordance with Lisa's request. The trial court explained that because "much was made at trial" about the current "equal time" parenting plan, it would analyze the matter as a "decision as to custody in the first instance under [RCW] 26.09.184 and.187(3)(a)(i)-(vii)." CP at 30. It then dramatically reduced Lawrence's time with the children and limited most of their visits to Omak and the surrounding area.
¶ 70 Because Lawrence and Lisa had already agreed to a parenting plan in 2002, the trial court erred in adopting a new one. The court should have analyzed the existing plan under the criteria in RCW 26.09.260, as Lawrence argued. See In re Marriage of Coy, 160 Wash.App. 797, 804, 248 P.3d 1101 (2011) (citing Schuster v. Schuster, 90 Wash.2d 626, 628-29, 585 P.2d 130 (1978)) ("After a trial court enters a final parenting plan, and neither party appeals it, the plan can be modified only under RCW 26.09.260."). RCW 26.09.260 allows a court to modify parenting plans only if there has been a substantial change in circumstances and the modification is "in the best interest of the child," except as otherwise provided in specified subsections. Subsection (6) provides that the court may modify residential portions of a parenting plan under the relocation statutes. RCW 26.09.260(6). But the presumption in the relocation statutes does not apply because neither parent qualifies as the primary residential parent in this case. Thus, subsection (6) does not change the general guidance articulated in paragraph (1): that the court consider parenting plan modifications in light of what is in the best interest of the child. RCW 26.09.260(1).

II. Relocation Factors
¶ 71 And even if we could fit Lisa's petition into the relocation statutory scheme, the trial court's findings are either disconnected from or unsupported by the evidence. For example, the trial court found that the bond between the children and Lisa was more "parent/child like" than the one between the children and Lawrence, who was more an "added team member." CP at 28. But the court cited no evidence to support this analysis. Thus, we do not know why Lisa was more parent-like than Lawrence and why Lawrence was only an "added team member." Certainly nothing in the record before us explains these characterizations. In fact, the record strongly suggests that Lawrence was more parent-like than Lisa if measured by his participation in his children's lives. Absent some attempt to link these labels to the evidence, these findings are not helpful.
¶ 72 The trial court also expressed concerns about the "[f]ather's ability to provide for the girls' needs ... given his short term memory issues and his lack of executive function capability." CP at 29. The court divined this from Lawrence's performance as a witness. But neither party presented any evidence that Lawrence lacked the ability to be an excellent father for the girls. In fact, *144 Lisa conceded that Lawrence "was a great Dad." CP, Attach. at 138. And the girls' teachers characterized Lawrence as an outstanding father who was very involved in his children's education. Thus, the court's comment is at best speculative and at worst an unfair use of Lawrence's disability.
¶ 73 The court also apparently speculated about the relative strength and involvement of "significant others" in the children's lives, finding "no reason for that [the children's bond with their grandmother and extended family] to change in nature with the relocation, although quantity of time may be more limited." CP at 28; RCW 26.09.520(1). More off-hand musing than reasoned evidentiary analysis, this comment is not a meaningful attempt to compare the quality of the children's lives in Edmondsspecifically the stability Lawrence and his family have providedwith their lives in the unknown environment of Omak. If the trial court meant simply that the girls and their grandmother would still love each other, Lawrence would undoubtedly agree. But that is not the question. The question is whether the children will be harmed by the loss of their grandmother's near-daily participation in their lives, combined with the disrupted bonds between the children and Lawrence and the other Fahey family members. And, if harm will occur, how does it compare to the benefits, if any, to the children from moving to Omak? Lawrence is entitled to more than the trial court's dismissive, cursory treatment of this issue.
¶ 74 In sum, there was no evidence to support either the trial court's application of the relocation presumption in Lisa's favor or its ultimate decision to approve her relocation and enact a new parenting plan. I would vacate the current parenting plan and remand to a different judge to consider Lawrence's petition to modify.
NOTES
[1] In this opinion, we use the parties' first names for clarity and we mean no disrespect.
[2] Lisa explained that her frequent moves were to get out of bad neighborhoods, have more affordable housing, be closer to new jobs, and to be closer to someone she was dating at the time; Lawrence suggested that Lisa's moves were primarily related to the beginning and ending of romantic relationships.
[3] Lawrence currently resides in a home in Edmonds. Although title is in his name, his parents bought the home and continue to make the mortgage payments.
[4] On February 19, 2010, Lawrence disputed whether Lisa's October 2009 letter fulfilled the notice requirements for relocating the children. But Lisa had recently filed a formal "Updated Notice of Intended Relocation of Children" with the trial court and appears to have perfected the requisite notice requirement with this filing. Clerk's Papers (CP) at 18; see RCW 26.09.440.
[5] The record does not clearly indicate whether Shannon meant that she did not want to move (1) from Puyallup, (2) from Edmonds, (3) to Omak, or (4) from her then current school.
[6] RCW 26.09.430 states,

Except as provided in RCW 26.09.460, a person with whom the child resides a majority of the time shall notify every other person entitled to residential time or visitation with the child under a court order if the person intends to relocate. Notice shall be given as prescribed in RCW 26.09.440 and 26.09.450.
[7] CR 54(f) states,

Presentation.
(1) Time. Judgments may be presented at the same time as the findings of fact and conclusions of law under rule 52.
(2) Notice of Presentation. No order or judgment shall be signed or entered until opposing counsel have been given 5 days' notice of presentation and served with a copy of the proposed order or judgment unless:
(A) Emergency. An emergency is shown to exist.
(B) Approval. Opposing counsel has approved in writing the entry of the proposed order or judgment or waived notice of presentation.
(C) After Verdict, etc. If presentation is made after entry of verdict or findings and while opposing counsel is in open court.
[8] There are 11 factors that an objecting person can rely on to rebut the relocation presumption.

(1) [t]he relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
(2) Prior agreements of the parties;
(3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;
(4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;
(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;
(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;
(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;
(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;
(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;
(10) The financial impact and logistics of the relocation or its prevention; and
(11) For a temporary order, the amount of time before a final decision can be made at trial.
RCW 26.09.520.
[9] Lawrence also argues that the trial court failed to enter a finding that Lisa provided the principal residence for the children. But the trial court stated in its April 23, 2010 letter ruling that "[b]ecause the court does believe that [Lisa] was intended to be the primary parent in the parties' parenting plan, the court will first decide this case in accordance with the usual relocation analysis." CP at 28. The trial court adopted and incorporated its April 23, 2010 letter ruling in its June 4, 2010 order denying Lawrence's objection to the relocation.
[10] We note that Lawrence can seek modifications to the parenting plan under RCW 26.09.260.
[11] Because we affirm, we do not address Lawrence's request for a new trial judge on remand or Lisa's request for a change of venue to Okanogan County Superior Court. But we note that the granting or denying of a change of venue, or transfer of a cause to another county, rests in the sound discretion of the trial court that has the matter for consideration. Kimball v. Pub. Util. Dist. No. 1 of Douglas County, 64 Wash.2d 252, 259, 391 P.2d 205 (1964).
[12] RCW 26.09.285 provides:

Solely for the purposes of all other state and federal statutes which require a designation or determination of custody, a parenting plan shall designate the parent with whom the child is scheduled to reside a majority of the time as the custodian of the child. However, this designation shall not affect either parent's rights and responsibilities under the parenting plan. In the absence of such a designation, the parent with whom the child is scheduled to reside the majority of the time shall be deemed to be the custodian of the child for the purposes of such federal and state statutes.
[13] From December 2009 through the end of Lawrence's charts in March 2010, the girls spent significantly more time with their father. But this schedule reflects the residential arrangement imposed under the temporary restraining order.