FILED
COURT OF APPEALS
DIVISION II

2013 SEP 10 AM 8: 40

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Parenting and Support of<br>K.B.K., | No. 43560-8-II |
| RICHARD D. JUDEN,<br>              Respondent, | |
| and | UNPUBLISHED OPINION |
| KAYLEE A. KILGORE,<br>              Appellant. | |

LEE, J.P.T.[1]— Kaylee Killgore appeals the trial court's denial of her petition to relocate with her child, KBK,[2] to Texas following a permanent parenting plan trial. She argues that the trial court abused its discretion by making findings not supported by the record and by failing to adequately consider the required statutory factors. We hold that the trial court abused its discretion in its consideration of the mandatory factors and in making numerous factual findings not supported by the record. Accordingly, we vacate the order restraining relocation and remand to the trial court for further proceedings.

---

[1] Judge Linda Lee is serving as judge pro tempore of the Court of Appeals, Division II, under CAR 21(c).

[2] We refer to KBK, a minor, by his initials to protect his privacy.

## FACTS

Killgore and Richard Juden had a brief romantic relationship in 2006, while both resided in Portland, Oregon. In August 2006, Juden moved to California to attend college. After his relocation to California, Killgore told Juden that she was pregnant. Killgore suggested Juden return to Portland; Juden suggested Killgore join him in California. Juden was skeptical that Killgore was pregnant and questioned whether he was the father. After a few weeks of arguing about Killgore's pregnancy, Killgore and Juden stopped communicating.

Killgore gave birth to KBK early in 2007. Shortly after KBK's birth, Killgore contacted Juden and invited him to meet KBK. Juden recalled that Killgore did not provide contact information, and he tried unsuccessfully to contact her.

Nearly two years later, in January 2009, deoxyribonucleic acid testing confirmed Juden's paternity. Shortly thereafter, Juden contacted Killgore and arranged a week-long trip to Portland to meet KBK. Juden and his wife stayed with Juden's grandparents during the visit. After an initial meeting and supervised visit at Juden's grandparents, Killgore allowed Juden and his wife to take KBK on unsupervised outings.

A temporary parenting plan was entered in April 2009, awarding primary residential time to Killgore and providing for limited residential time for Juden, including bi-monthly travel to Portland/Vancouver and twice weekly video conferencing. Both Killgore and Juden were found in contempt for missing videoconference contacts. On November 18, 2009, in combination with a second order finding Juden in contempt, the trial court suspended Juden's contact with KBK under the April 2009 temporary parenting plan pending further court action.

Nearly two years later, in October 2011, Juden hired counsel and proposed a permanent parenting plan for KBK. Killgore filed a competing permanent parenting plan. On March 7, 2012, the trial court entered an interim order reinstating Juden's contact and providing for long weekend visits in March and April and a two-week summer residential opportunity in southern California. All other parenting plan issues were reserved for future determination and the matter was set for trial on May 1, 2012.

Killgore and KBK lived with Killgore's mother, Chris Killgore-Lannan, in Vancouver, Washington, for almost all of KBK's life.[3] Prior to January 2011, Killgore worked at Clark College, did household chores in exchange for room and board at her mother's house, and attended college working toward a nursing degree. Around January 2011, Killgore stopped taking classes and working at Clark College to give birth and care for her second child.

In mid-March 2012, Killgore's mother accepted a better paying job requiring her to move to Texas. On March 16, Killgore provided notice of her intent to relocate KBK to Texas to live with her mother. Juden objected to the relocation. On May 1, the scheduled trial date for establishment of a permanent parenting plan, the trial focused primarily on the relocation issue.

Killgore testified that she, KBK, and her other child had been renting a house, but as of May 1, the day of trial, they were living in a hotel and had no other housing arranged in the area. She also testified that she did not have a job or any money. Killgore acknowledged that she could find work as a certified nursing assistant (CNA) in the Vancouver area with her current education, but she explained that daycare costs would be more than her income.

---

[3] For a brief period of time in 2010, Killgore and KBK resided with Gary Warden, the father of Killgore's younger child.

3

Killgore intended to move in with her mother in Texas. She planned to exchange chores and cleaning for room and board for her and her children, just as she had before her mother moved to Texas. She also planned to attend Texas Women's University to earn a bachelor's degree in nursing.

Juden continued to object to Killgore's proposed relocation of KBK. Both Juden and his wife stated that they were committed to moving to Portland before the end of the year and, ideally, they would move by September. Juden's grandparents agreed to rent their Portland home to Juden and his wife when the grandparents transitioned to a retirement community in June.

The trial court denied Killgore's petition to relocate KBK to Texas. It found that the detrimental effects of allowing KBK to move to Texas outweighed the benefits of the move to KBK and Killgore, that Killgore was the primary caregiver, and that being separated from Killgore would be more detrimental to KBK than separation from Juden. The trial court also found that Killgore's primary reason for relocation was to be near her mother, upon whom she is financially dependent, and that this reason did not justify allowing Killgore to move KBK to Texas. It further found that Killgore could attend nursing programs in Washington or Oregon, and that she is employable with her present training. According to the trial court, relocating KBK to Texas would remove him from an environment that he was used to and that the quality of life is better in Washington than in Texas. It further found that Juden articulated a viable plan for moving to Portland and that long distance travel between Texas and Los Angeles or Texas and Portland were not good scenarios. Finally, the court found that Killgore had no realistic plan to become self-supporting in Texas in less than three years, and that her financial and educational opportunities in Washington and Oregon met or exceeded those in Texas. For those reasons, the

trial court concluded that the presumption in favor of relocation had been rebutted and it denied relocation.

On May 18, 2012, the trial court entered the written order denying relocation, a final order establishing a residential schedule, a parenting plan, and a child support order. The order establishing the residential schedule and parenting plan adopted and incorporated by reference the interim residential plan/parenting plan signed on March 7, 2012. The trial court scheduled a review hearing in August 2012.

Killgore sought timely discretionary review of the trial court's order denying her the ability to relocate with KBK. Killgore did not appeal the order establishing the residential schedule and parenting plan. We granted discretionary review to determine whether the trial court's findings regarding its denial of Killgore's petition to relocate KBK were supported by the record.

## ANALYSIS

Killgore appeals the trial court's denial of her petition to relocate KBK to Texas. She argues that the trial court abused its discretion because it failed to adequately consider the statutory relocation factors and made findings not supported by the record. We agree that the trial court abused its discretion in its consideration of the mandatory factors and in making numerous factual findings not supported by the record.

I.  STANDARD OF REVIEW

We review the trial court's decision to grant or deny a petition for relocation for abuse of discretion, which is whether the court's decision was manifestly unreasonable or based on untenable grounds or reasons. *In re Marriage of Horner*, 151 Wn.2d 884, 893-94, 93 P.3d 124 (2004).

"A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard."

*Horner*, 151 Wn.2d at 894 (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)). We uphold trial court findings if they are supported by substantial evidence. *In re Marriage of McDole*, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). "Substantial evidence exists if the record contains evidence of a sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." *In re Marriage of Fahey*, 164 Wn. App. 42, 55-56, 262 P.3d 128 (2011), *review denied*, 173 Wn.2d 1019 (2012).

## II. RELOCATION STANDARD

In 2000, the legislature passed the Child Relocation Act (CRA), RCW 26.09.405-.560, which shifts the analysis away from the best interests of the child to an analysis focusing on the best interests of the child and the relocating person. LAWS OF 2000, ch. 21, §§ 1, 14; *Horner*, 151 Wn.2d at 886-87. The CRA creates a rebuttable presumption that the relocation will be allowed, which may be rebutted when the objecting party proves that "the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person, based upon [11 child relocation] factors." RCW 26.09.520. The factors are:

(1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;

(2) Prior agreements of the parties;

(3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;

(4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;

(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;

(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;

(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;

(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;

(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;

(10) The financial impact and logistics of the relocation or its prevention; and

(11) For a temporary order, the amount of time before a final decision can be made at trial.

RCW 26.09.520.

These factors are not listed or weighed in any particular order. RCW 26.09.520; *Horner*, 151 Wn.2d at 887. The trial court must consider each of the factors and find by a preponderance of the evidence that they show that relocation would be more detrimental than beneficial, and it must make findings on the record regarding each of the factors. *Horner*, 151 Wn.2d at 895-97; *In re Marriage of Wehr*, 165 Wn. App. 610, 613, 267 P.3d 1045 (2011).

III. THE TRIAL COURT'S FINDINGS

Killgore challenges the trial court's analysis of 9 of the 11 relocation factors.[4] Killgore asserts that the trial court's findings are either unsupported by the record or demonstrate that the trial court did not properly consider the required factors. The record establishes that the trial court failed to adequately consider the relocation factors and made numerous factual findings that are not supported by the record. Thus, the trial court's decision was based on untenable grounds, which constitutes an abuse of discretion. *Horner*, 151 Wn.2d at 894.

---

[4] Killgore does not challenge the trial court's findings related to factors 3 and 11.

7

A. RCW 26.09.520(1)—Child's Relationship with Parents, Siblings, and Other Significant Persons

The first relocation factor requires the court to consider "[t]he relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life." RCW 26.09.520(1). Here, the trial court found that Killgore had been KBK's primary caregiver and Juden was not involved with KBK until paternity was established in 2009.

Killgore argues that the trial court failed to consider the bond between KBK and his sister and KBK and his maternal grandmother, Killgore-Lannan. Killgore is correct that the trial court's written findings do not address KBK's relationship with his grandmother or his sister. In its oral findings, the trial court stated, "Other significant persons in the child's life. Well, I suppose you have grandma, but we have uncles, too, which is a concern." Report of Proceedings (RP) at 168. While this is an acknowledgement of the existence of other persons in the child's life, it falls short of any finding regarding the nature, quality, extent of involvement, and stability of the child's relationship with other significant persons in the child's life. Thus, the trial court did not properly consider KBK's relationship with his grandmother.

The trial court also failed to consider the relationship between KBK and his sister in its findings. The trial court's only finding regarding KBK's relationship with his sister appears to be based on Killgore's testimony that she would not relocate without KBK. At the end of its oral ruling, the trial court stated that Killgore controlled KBK's relationship with his sister— presumably because Killgore could choose to stay in Vancouver and keep the siblings together or she could separate the sibling by relocating to Texas without KBK. RCW 26.09.530 expressly

prohibits the trial court from admitting evidence about whether a person will forego his or her own relocation if the child is prevented from relocating.[5]

Here, the trial court failed to consider KBK's relationship with his grandmother and failed to properly consider KBK's relationship with his sister. Thus, we conclude that the trial court did not adequately consider this factor.

B. RCW 26.09.520(2)—Prior Agreements of the Parties

The second relocation factor requires the court to consider prior agreements of the parties. The trial court found that there were no agreements between the parties regarding relocation.

Killgore argues that the trial court abused its discretion by not considering the parties' de facto agreement. She argues that the parties' history and course of conduct illustrates an expectation of long distance parenting amounting to a de facto agreement.

The undisputed evidence showed that Juden lived in California at the time Killgore told him she was pregnant with KBK, and Juden remained in California throughout KBK's life. Because Juden lived in California, he sought and exercised residential time consistent with long distance parenting: bi-monthly visits and video conferencing, which were suspended after seven months because Juden was twice found in contempt. Killgore argues that this history amounted to an agreement or expectation of long distance parenting.

---

[5] RCW 26.09.530 provides:
> In determining whether to permit or restrain the relocation of the child, the court may not admit evidence on the issue of whether the person seeking to relocate the child will forego his or her own relocation if the child's relocation is not permitted or whether the person opposing relocation will also relocate if the child's relocation is permitted.

9

Juden's testimony showed that he did not share that expectation. Juden testified that he struggled with long distance parenting and infrequent contact and that he was committed to moving to Portland by the end of the year to be closer to KBK.

The trial court found Juden's testimony credible and found that Juden was happy to relocate to Portland and that he had a viable plan and timetable for moving in the near future. We conclude that the trial court's finding that there was no prior agreement between the parties for permanent long distance parenting by Juden was supported by substantial evidence.

C. RCW 26.09.520(4)—Limitations to Residential Time under RCW 26.09.191

The fourth relocation factor requires the court to consider "[w]hether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191." RCW 26.09.520(4). RCW 26.09.191 limits a parent's decision-making authority and residential time with a child if the parent has engaged in certain conduct.

The trial court found that neither parent was subject to limitations under RCW 26.09.191. In its oral ruling, the trial court stated:

> Number four, whether either parent or person entitled to residential time with the child is subject to limitations under 26.09.191. I think [Killgore] alleges that. I don't see anything in there that would indicate any restrictions on either parent's behalf, so that's a non factor.

RP at 168.

Killgore argues that the trial court's finding is not supported by the record because the trial court failed to acknowledge her testimony asserting two circumstances that should limit Juden's residential time with KBK. Killgore argues that the record demonstrated that Juden (1) "willfully abandoned KBK for an extended period of time and failed to perform any parenting

10

functions" and (2) has " 'a history of acts of domestic violence.' " Br. of Appellant at 18, 20 (quoting RCW 26.09.191(1)(c)).

With regard to abandonment, Killgore points to her testimony that Juden did not acknowledge KBK until his paternity was confirmed almost two years after KBK's birth. She also testified that after paternity was established and residential time ordered, Juden missed videoconference visits in 2009, which prompted the court to suspend visitation for almost two years, from November 2009 until October 2011. The trial court acknowledged that Juden did not have contact with KBK for the first two years of his life and that after paternity was established Juden's visitation with KBK was inconsistent. However, the trial court also considered that in the six months prior to trial, visitation under the temporary parenting plan had been consistent and satisfactory.

With regard to Juden's alleged history of domestic violence, Killgore directs this court to evidence of a restraining order against Juden obtained by a former girlfriend and a charge of domestic violence against Juden related to an incident that occurred at his wife's office. Both Juden and his wife testified that the incident at her workplace was blown out of proportion. They testified that Juden and his wife accidently broke her glasses when the ill-fitting glasses fell off her face during a struggle to reach a flash drive. A co-worker called the police. Juden and his wife attended marriage counseling and the charges were dropped.

The trial court asked when the incident occurred that prompted the restraining order and whether it resulted in conviction. Upon learning that there was no conviction and the incident occurred in 2005 or 2006, before Juden and Killgore met, the trial court stated that it was beyond the scope of the issues relevant in the relocation hearing. Thus, the trial court considered the evidence and found it not probative.

No. 43560-8-II

Contrary to Killgore's assertion, the trial court expressly considered Killgore's allegations of abandonment and domestic violence along with other evidence and testimony and found no circumstances warranting limitation of residential time. We do not review credibility or reweigh the evidence. *Fahey*, 164 Wn. App. at 62. We conclude that the trial court's finding is supported by substantial evidence and that the trial court properly considered this factor.

D. RCW 26.09.520(5)—Good Faith and Reasons for Seeking/Opposing Relocation

The fifth relocation factor requires the court to consider "[t]he reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation." RCW 26.09.520(5). Here, the trial court made the following written findings:

> [Killgore]'s primary expressed reason for relocation is to be near her mother upon whom she is dependent financially. The analysis of statutory relocation factors do not justify [Killgore] moving [KBK] to Texas because [she] wants to reside with the maternal grandmother.
> [Killgore] also expresses the availability of educational opportunities for [herself] in Texas as a reason justifying [her] relocation with [the] child.
> There are plenty of quality nursing programs in Washington and Oregon. These include Washington State University-Vancouver, Portland State University, University of Portland, Concordia, Clark College (which [Killgore] has attended off and on for seven years) and other programs.
> [Killgore] has a CNA credential and is employable.
> It is disturbing to the court that the relocation issue arose right before trial.

Clerk's Papers (CP) at 329-30. In its oral ruling the trial court also acknowledged that Killgore and Juden both planned to make drastic changes—referring to Killgore's plan to move to Texas and Juden's plan to move to Portland.

Killgore argues that the trial court ignored several of the reasons she articulated for moving to Texas and did not adequately address her desire to be closer to her mother or her educational pursuits in Texas. We agree.

12

Killgore identified the following reasons why she and KBK would benefit from relocating to Texas: (1) she did not have a job in Washington or a place to live; (2) she relies on her mother for room and board in exchange for domestic services; (3) she can finish her bachelor's degree in nursing at Texas Women's University; (4) she has been unable to get off the waiting list for the nursing program at Clark College in Vancouver; (5) when she completes her education she will have more job opportunities in Texas because there are more hospitals in the Rowlett area than in Vancouver; (6) the schools for KBK are better in Texas; and (7) housing is less costly in Texas.

Killgore's reasons for moving to Texas fit under two broad categories: present financial dependence on her mother and long term economic, housing, and educational benefits for Killgore and KBK. Although Killgore had a CNA credential, was employable, had previously shared expenses with a roommate in the Portland area, and had exchanged childcare services with friends to keep childcare costs low in the past. Killgore testified that if she stayed in Vancouver and found employment, with her current education, her salary would not cover her living expenses and childcare costs. In Texas, Killgore will have the benefit of her support network, including assistance with childcare and rent in exchange for providing cooking and cleaning services for her mother. Killgore also testified that she was presently unemployed, homeless, and reliant on her mother, who had already moved to Texas. With regard to education, Killgore had apparently been on a waiting list for the nursing program at Clark College for years; whereas, Texas Women's University had assured her that she would be admitted. Furthermore, she planned to live in Texas for six months before enrolling in school to gain residency for reduced tuition. Killgore further testified that her employment opportunities in Texas will be greater as there were 18 hospitals in the area where she intended to relocate.

The undisputed evidence showed that Killgore's mother, Killgore-Lannan, and other family members had been around KBK for his whole life and that Killgore-Lannan provided room, board, and care for both KBK and Killgore until Killgore-Lannan moved to Texas shortly before the trial. Killgore was reliant upon the room, board, and care her mother provided in order to complete her education. In addition, while Killgore had been unsuccessful in getting off the waiting list for the nursing program at Clark College in Washington, she had met with Texas Women's University staff regarding her acceptance into their nursing program.

Juden's cousin, a freshman in the nursing program at Concordia University in Portland, testified that she worked at a part-time caregiving job and that similar jobs were plentiful in the Portland/Vancouver area. She also testified that she knew many parents who were working toward their bachelor's in nursing at Concordia and that Concordia and other schools in the area offered part-time night classes.

The trial court found that Killgore had been supported by her mother for several years, she had not had full-time employment for six years, she received child support from Juden and from the father of her other child, she had expressed no realistic plan to become self-supporting in Texas in less than three years, and her financial and educational opportunities in Washington and Oregon met or exceeded those in Texas, especially considering the amount of time she had invested toward a degree in Washington. Apparently, the trial court relied on the testimony of Juden's niece, a first year student, about her educational and employment situation rather than Killgore's actual experiences in the Vancouver/Portland area in concluding that Killgore could afford to pay for housing, food, college, and daycare while working nights as a CNA, as well as its own opinion about the differences between Texas and Washington opportunities.

14

While we might weigh this testimony differently, we do not reweigh evidence or make credibility determinations on appeal. *Fahey*, 164 Wn. App. at 62. Our review is limited to determining whether the trial court considered the statutory factors and whether the factual findings are supported by the record. *Horner*, 151 Wn.2d at 896.

The evidence fails to support the trial court's finding that Killgore merely "wants" to reside with her mother, KBK's maternal grandmother. Rather, the undisputed evidence showed that Killgore relied upon the care and financial support Killgore-Lannan provided to KBK and Killgore. Furthermore, regardless of whether Killgore merely wanted to reside with her mother or relied upon the care and financial support Killgore-Lannan provided to KBK and Killgore, there was no evidence that Killgore was seeking the relocation in bad faith. Moreover, the trial court's findings regarding Killgore's educational opportunities were not based on the evidence, but on its own opinion as to the educational opportunities in Washington versus Texas. Thus, the trial court's findings under the fifth factor are not supported by the record.

E. RCW 26.09.520(6)—Impact of Relocation on Child's Development

The sixth relocation factor requires the court to consider "[t]he age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child." RCW 26.09.520(6). Here, the trial court found that relocating KBK to Texas would remove him from an environment that he is used to and that the opportunities for KBK's educational development in Washington or Oregon met or exceeded those in Texas. The trial court also found that KBK had no special needs.

Killgore argues that the trial court did not consider KBK's emotional and physical needs because it failed to consider Killgore's testimony that she and KBK were staying in a hotel and

15

would become homeless if not permitted to relocate to Texas. Killgore also argues that the trial court failed to acknowledge that KBK's environment had already changed because his grandmother, with whom he had resided for almost his entire life, had relocated to Texas.

Killgore is correct that the trial court did not expressly consider that KBK's environment had changed upon his grandmother's relocation to Texas, essentially eliminating the status quo. The major change for KBK was losing his maternal grandmother and uncles and the household that he had grown up in. Killgore is correct that the trial court failed to adequately consider the disruption to KBK's stability by requiring his mother to rebuild her entire life without the support she had relied on for her and her two children within her mother's household. Thus, the trial court's finding that moving to Texas would take "KBK from an environment he is used to" is not supported by substantial evidence. CP at 330.

Finally, Killgore challenges the trial court's finding that the opportunities for KBK's educational development in Washington or Oregon met or exceeded those in Texas. She argues that the finding is not supported by the record.

The only information in the record about schools for KBK in Texas came from Killgore. She testified that KBK would attend a school in the Garland Independent School District in Rowlett, Texas. Further, she testified that based on her research the schools in that district were award-winning and were rated as excellent facilities for education.

The trial court found that education in Washington or Oregon met or exceeded that of Texas. There is no evidence in the record (other than the trial court's own opinion)[6] that supports its finding that KBK's opportunity for educational development in Washington was

---

[6] The trial court informed Killgore that Washington ranks in the top five states for college-educated populaces.

equal to or better than in Texas. Thus, we conclude that the trial court's finding is not supported by substantial evidence in the record.

F. RCW 26.09.520(7)—Quality of Life in Current and Proposed Locations

The seventh relocation factor requires the court to consider "[t]he quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations." RCW 26.09.520(7). Here, the trial court found that Washington had a better quality of life than Texas, "[The] [q]uality of life, resources and opportunities available to [KBK] and to [Killgore] are excellent in Washington and Oregon. The quality of life is better in Washington than in Texas." CP at 331.

Killgore argues that the trial court's finding is not supported by the record. We agree.

The trial court's oral finding makes it clear that its finding was based on the court's own subjective opinion about the quality of life in Texas and Washington, rather than any evidence about the quality of life, resources, and opportunities available to Killgore and KBK. This is not a fact that a court may take judicial notice of. We conclude that the trial court's general comparison of the two states is a misapplication of the factor and its finding related to this factor is not supported by the record.

G. RCW 26.09.520(8)—Available Alternatives To Continue Relationship with Non-Relocating Parent

The eighth relocation factor requires the court to consider "[t]he availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent." RCW 26.09.520(8). The trial court found that Juden is more than happy to relocate to Portland and has a viable plan and time table for moving to Portland in the near future. The trial court

17

also found that long distance travel between Texas and Los Angeles or Texas and Portland are not good scenarios for KBK.

Killgore argues that the trial court failed to acknowledge that Juden had been residing in another state for KBK's entire life. Killgore also argues that Juden's relationship with KBK has always been long distance and, therefore, relocating KBK to Texas would not substantially change his relationship with Juden as Juden could continue contact with KBK by flying to Texas. Essentially, Killgore argues that long distance trips between Texas and Los Angeles or Texas and Portland were no less favorable than the long distance trip between Portland and Los Angeles, which was the status quo.

It is undisputed that Juden had resided in California for KBK's entire life. But factor eight is concerned with fostering and continuing KBK's relationship with Juden *in the future*.

The trial court heard testimony from Juden, his wife, and his grandmother that the Judens planned to relocate to Portland by the end of the year to be closer to KBK. This evidence supports the trial court's finding that Juden was happy to relocate to Portland and had a viable plan to do so in the near future.

The trial court also recognized that granting the relocation would necessarily require Juden or KBK to travel between Texas and Los Angeles or Texas and Portland to maintain contact. The trial court found that neither scenario was favorable. Implicit in the trial court's finding is that Juden's proposed plan to move to Portland would change the status quo that had existed during KBK's entire life; unite Juden, Killgore, and KBK in the same metropolitan area; and eliminate the travel and long distance parenting. Therefore, in comparison to this scenario, long distance travel between Texas and Los Angeles or Texas and Portland was unfavorable.

We conclude that the trial court's findings and implicit inferences are supported by substantial evidence in the record. The trial court properly considered this factor.

H. RCW 26.09.520(9)—Alternatives to Relocation and whether It Is Feasible and Desirable for Other Party To Relocate Also

The ninth relocation factor requires the court to consider "[t]he alternatives to relocation and whether it is feasible and desirable for the other party to relocate also." RCW 26.09.520(9).

Neither party presented evidence related to Juden's desire or ability to relocate to Texas. Instead, evidence and testimony focused on Juden's plan to relocate to Portland and Killgore's alternative to relocating.

The trial court heard testimony that Juden grew up in Portland, both sides of his family lived there, he and his wife planned to move to Portland by the end of the year, and they had arranged to rent a home from Juden's grandparents, who were moving to a retirement community. The trial court also heard testimony and inquired specifically about Killgore's ability to remain in Vancouver, including opportunities for housing, employment in the caretaking field with her existing CNA qualification, and pursuit of her nursing degree in the Vancouver/Portland area.

Here, the trial court repeated its findings that Juden was more than happy to relocate to Portland and had a viable plan and timetable for moving to Portland in the near future. The trial court also found that Killgore had employment and educational opportunities available in Washington and Oregon that met or exceeded those available to her in Texas. In its oral ruling, the trial court opined that it did not know if Juden would want to move to Texas, but it highly doubted that he would want to relocate to Texas because there were probably fewer opportunities there in the film industry.

19

The trial court made an unwarranted assumption in its oral ruling about Juden's not wanting to relocate to Texas, but this is not fatal because the court acknowledged that it did not know if Juden wanted to go to Texas and was merely speculating based on Juden's work history in the film industry. Moreover, the trial court omitted its speculation from the written findings.

Because there was no evidence presented about the desirability or feasibility of Juden relocating to Texas, the trial court's written findings on factor nine focused on Killgore's alternative to relocating—remaining in the Vancouver/Portland metropolitan area and finding housing, employment, and an alternate nursing program. As addressed above, Killgore's alternatives to relocation left her in the Vancouver area unemployed and homeless. Without the benefit of her support network, Killgore's employment opportunities based on her current training would not allow her to cover her living expenses and childcare costs. Contrary to the evidence, the trial court relied on its own opinion about the differences between opportunities in Washington and Texas. Thus, the trial court's findings on this factor were not supported by the record and were based on untenable grounds.

I. RCW 26.09.520(10)—Financial Impact of Relocation

The tenth relocation factor requires the court to consider "[t]he financial impact and logistics of the relocation or its prevention." RCW 26.09.520(10). Here, the trial court found Killgore had been residing in the Portland/Vancouver area for several years, had been supported by her mother for several years, and had not had full-time employment for six years. The trial court also found that Killgore received child support from Juden and her other child's father, and she had expressed no realistic plan to become self-supporting in Texas in less than three years. Finally, the trial court found that Killgore's financial and educational opportunities in

20

Washington and Oregon met or exceeded those in Texas, especially considering the amount of time she had invested toward a degree in Washington.

Killgore argues that the trial court's finding related to her employment is not supported by the record. The trial court's oral ruling states that Killgore had not been employed for six years, but the trial court corrected this finding in its written rulings to state that she had not had *full-time* employment in six years. This finding is supported by the record because Killgore described only part-time work while she was attending college, which she had done since 2007. Thus, the trial court's finding is supported by the record.

Killgore also argues that the trial court failed to consider her testimony that she had not been able to get a job in Washington, that she and her children would become homeless because her mother no longer had a home in Washington, and that her job prospects and ability to become self-sufficient were better in Texas.

Killgore testified that she could not secure housing and a job with a salary that would cover her living expenses in Washington. The trial court also heard testimony that Killgore had a CNA certificate, that there were jobs in her field in the Vancouver/Portland area, and that she received child support from Juden and the father of her other child. Based on this testimony and its colloquy with Killgore about her opportunities for housing and job placement in Washington and those in Texas, the trial court concluded that she could support herself and two children in a household she did not have at the time.

While the trial court is solely responsible for weighing evidence and determining credibility, *Fahey*, 164 Wn. App. at 62, the trial court did not make findings that allow us to conclude that it considered the evidence before it on these issues rather than on its own belief that Killgore should be required to stay in a community with no housing, job, or living wage

21

No. 43560-8-II

employment. Therefore, we conclude that the trial court based its conclusions on this factor on untenable grounds.

IV.    CONCLUSION

The trial court did not adequately consider the mandatory factors, made numerous factual findings that the record does not support, and made numerous findings based on its own opinions rather than the evidence. Reliance on unsupported factual findings results in an untenable decision. *Horner*, 151 Wn.2d at 894. Because the trial court's decision was based on untenable grounds, which constitutes an abuse of discretion, the trial court's order restraining relocation is vacated. This matter is remanded to the trial court for proper consideration of the relocation factors.

The trial court's injection of its own opinions regarding the quality of life and educational opportunities in Texas and Washington evidences a clear bias in favor of Washington over Texas. Therefore, we remand for trial before a different judge.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

LEE, J.P.T.

We concur:

WORSWICK, C.J.

JOHANSON, J.

22