FILED
COURT OF APPEALS
DIVISION II

2015 JUL 28 AM 8: 24

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Matter of the Marriage of | No. 45042-9-II |
| JAMES ERNEST DUNN, | |
| Respondent, | |
| and | |
| MELISSA JO DUNN, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, C.J. — Melissa Jo Dunn appeals the trial court's denial of her request to relocate her child and the parenting plan modification changing primary residential placement of her daughter to the father, James Ernest Dunn. Melissa[1] argues that (1) the trial court failed to consider the child relocation factors required under RCW 26.09.520, and (2) the trial court lacked the authority to modify the parenting plan without first finding adequate cause following the denial of the relocation request. Because the trial court failed to address all of the required child relocation factors, failed to recognize the presumption of relocation, and failed to apply the correct legal standard, we vacate the order denying relocation. And because any related modification must

---

[1] Because Melissa and James share the same last name, we refer to them by their first names for clarity; we intend no disrespect.

wait until after the relocation issue is resolved, we vacate the modified parenting plan. We remand this matter for further proceedings before a different judge.

FACTS

I. PARENTING PLANS

Melissa and James have a daughter together. On November 30, 2007, when the child was three years old, their marriage was dissolved, and the trial court entered a final parenting plan in which the child resided the majority of time with Melissa.

In February 2012, Melissa moved to modify the dispute resolution, decision making, and transportation provisions of the November 2007 parenting plan. She alleged, among other matters that James had been harassing and stalking her, that James had "sexually assaulted her since the divorce," that he had recently attacked her boyfriend, Robert Enriquez, and that he had endangered the child in various ways. Clerk's Papers (CP) at 109. Melissa also requested a domestic violence protection order. The trial court found adequate cause for a modification and entered a temporary order which, among other things, (1) appointed a guardian ad litem (GAL) for the child, (2) extended a February 3, 2012 restraining order, but only as to Melissa, and (3) restricted James's contact with Melissa to only e-mail intended to facilitate the parenting plan.

The parties eventually agreed on a new parenting plan which the court approved; this parenting plan was filed June 8, 2012. Under the June 2012 parenting plan, the child was to reside the majority of the time with Melissa with alternating every-other-week weekend and mid-week visitation for James. The child was also to stay with James for the first half of her 2012 summer vacation. The new parenting plan also prohibited James from coming onto Melissa's property or entering her workplace or school. When the June 2012 parenting plan was entered, both parents lived in McCleary, in Grays Harbor County, Washington.

2

## II. NOTICE OF INTENT TO RELOCATE AND MOTION FOR TEMPORARY ORDER

On July 24, 2012, Melissa filed a notice of intent to relocate the child to Kitsap County, and a motion for a temporary order permitting relocation of the child. In the motion, notice, and accompanying documents, Melissa stated that (1) she had just received notice that she and the child had to vacate their current home in McCleary by July 31 because of a foreclosure sale,[2] (2) in May, she had started a new full-time job with a funeral home in Bremerton, (3) she had located a new home to lease that was closer to her work, and (4) she was seeking to reduce her three-hour daily commute. Melissa also stated that she had the opportunity to earn more money if she lived in Kitsap County and was available to assist the funeral director with calls. Melissa asserted that the June 2012 parenting plan did not need to be revised because "all visitation can remain the same."[3] CP at 14.

James objected to the relocation. In addition to addressing the child relocation factors under RCW 26.09.520, James asserted that (1) the relocation would adversely affect his visitation, and (2) Melissa had not acted in good faith in entering into the June 2012 parenting plan because she was aware that she would be seeking relocation so she could live with Enriquez in his mother's

---

[2] In an accompanying affidavit, Melissa explained that although she knew the house she had been leasing would be sold in a foreclosure auction in May 2012, she was not told that she could not continue to lease the home from the new owners until just before she filed the relocation paperwork. At a later hearing, she testified that she found out she could no longer lease the house two days before she filed her notice and motion.

[3] Melissa did not disclose the new address or workplace address in these documents, asserting that the June 2012 parenting plan stated James was not to come to her home or work and that she was afraid he would harass her.

home. James also requested that the trial court modify the parenting plan to "change in the residence in which the child resides the majority of the time." CP at 21.

### III. AUGUST 1, 2012 HEARING AND TEMPORARY ORDER

On August 1, 2012, the trial court held a hearing on the motion to relocate.[4] The parties presented evidence related to (1) whether Melissa had acted in bad faith by negotiating the June 2012 parenting plan despite knowing that she would be seeking relocation soon after that parenting plan was entered, (2) when Melissa learned she could not continue to rent her McCleary home, (3) whether Melissa had relocated the child before filing the notice and motion to relocate, (4) Melissa's job search and her new job, (5) how the relocation might impact James's visitation and what Melissa was willing to do to facilitate the existing schedule, (6) the child's current schooling and relationships with her family and friends, (7) the resources and schools available to the child if the court allowed relocation, and (8) the location and type of housing Melissa had arranged in Kitsap County. The parties also presented evidence that Enriquez had been charged with second degree assault of James with a firearm.[5]

In her written pleadings, Melissa refused to disclose the address of the proposed new residence or her new job, asserting that she feared that James would harass her and that the June 2012 parenting plan prohibited James from coming to her place of work or residence. When Enriquez testified, he stated that he was currently living in Lynnwood with his sister but that he

---

[4] This hearing and the subsequent hearings were not before the same judge involved in the June 2012 parenting plan.

[5] When the issue of the assault arose, the trial court, who was also sitting on the criminal case, prohibited the parties from asking about the assault to avoid creating any issues with the criminal trial.

intended to move in with Melissa when she relocated to Manchester, Kitsap County. He refused to disclose who owned the home in Manchester or its address. Enriquez also testified that his contact with his daughter had been restricted to supervised visits based on allegations of alcohol use and the alleged assault.

The trial court "temporarily" denied relocation of the child and reappointed the GAL. The trial court then made the following statement:

> You [Melissa] can go right ahead and move. What I am also going to do, is, temporarily, following the day before Labor Day, the child will go to her father. The parenting plan will be temporarily reversed. The child will live with her father. You will have his visitation -- I wouldn't interrupt me.
>
> . . . .
>
> . . . I will tell you something right now, if you want to hear it, young woman. I think you have just about played enough games with the system. You were not forthright in dealing with this parenting plan. You were not forthright in allegations you made in your attempt to [relocate]. Your witness comes in here and refuses to answer questions. We are sitting here waiting for issues regarding a felony trial. And here we are, and you want to interrupt. And you can sit here and recite what you want about what's in your parenting plan. There is nothing in your parenting. plan that says he [James] isn't supposed to know where you live or work. It says he doesn't come there and bother you. And it also has about a page and a half of relocation - what you are supposed to do. So, to use the word, I believe, forthright, does not apply to you.
>
> Now, what we are going to do is real simple.
>
> No, the kid is not moving right away.
>
> Yes, you are going to have your chance to say and prove why you should.
>
> And yes, you are going to get a right to have a potential hearing on a modification.
>
> So, no, we are not moving this kid away.
>
> Secondly, go ahead and get yourself established and done it [sic].
>
> Next, the kid is going to live with daddy under the parenting plan, and we are going to have a hearing on custody of this kid, and the primary residential placement, I may put her back with you, I don't know. But I am going to have [the GAL] get me a hearing and I am going to wait until this guy's felony trial is over with, so I can get him to answer questions.
>
> And that kid is going to go to school and she is going to be there, and you are going to be an extremely polite gentleman. And not only that, you can even drive down from Manchester on Wednesdays and Thursdays and visit, that's up to you.

The bottom line is, we are going to have a hearing, and it will be heard prior to November 16th, because if the County Commissioners don't want [to] give me any money, I am not conducting anything from November 19th to January first.

So, you go get a date. We are not hearing it until a minimum of November one.

So, bottom line, we are reversing for a short period of time.

You make your arrangements. Get your place set up.

The [GAL] is going to check on stuff.

Your boyfriend can get his trial over with, then I am going to have more information, and we are going to be forthright.

Number two, you [James] are going to take care of the kid, and you are going to make sure the kid is a gentleman, excuse me, a young lady, and going to school. Do you understand that?

Report of Proceedings (RP) (Aug. 1, 2012) at 47- 50.

The trial court then allowed Melissa to speak. She said, "Um, I have full custody. I would be happy to move in with my mom, which is next door to [James]." RP (Aug. 1, 2012) at 50. The trial court responded,

I just made a ruling.

. . . .

. . . If I am going to stick this kid somewhere else in another county, you are going to go there and get set up so the [GAL] can visit and figure out what kind of house we got, and what the schools are like. We are not doing this again.

. . . .

. . . And the bottom line is, I am going to find out which one of you people can cooperate and be nice.

Now, you get her, and she [Melissa] has got her summer left yet too. You [James] are not interrupting that. I don't care whether she goes with the kid.

. . . .

Now, I want to have a hearing about this kid in the future. I want to have it in November, and I want to deal with two people, and I want all the cards on the table. About the time I get a feeling in this thing again, that I have been mislead [sic], there is going to be real unhappy people.

6

And you [Melissa] owe $150 bucks,[6] you got 30 days to pay it.
You [James's counsel] owe $50 bucks,[7] and got 30 days to pay it. Give it
to the court clerk's office. Thank you. We are done.

RP (Aug. 1, 2012) at 50-51. The trial court then issued a written order memorializing this oral ruling.

### IV. JANUARY 24, 2013 HEARING AND FINAL ORDER

The court reconvened on January 24, 2013, after Enriquez's acquittal on the assault charge. The trial court first discussed whether it should recuse on this matter. It advised the parties that as the judge in the criminal case, it had the opportunity to observe Enriquez, Melissa, and James testify under oath and that it intended to use information from the criminal trial if the parties agreed to allow it to do so. Both parties agreed to go forward and agreed that they did not object to the trial court using information from the criminal trial.

At this hearing, the GAL testified and was cross-examined by Melissa and James. Melissa and James also testified and presented their own witnesses. The evidence addressed the same issues presented at the August 1, 2012 hearing, focusing largely on whether Melissa had planned to move before agreeing to the June 2012 parenting plan. The evidence also addressed (1) how

---

[6] Throughout this hearing, the trial court admonished Melissa for "interrupting" or speaking over James's counsel when he was cross-examining her. RP (Aug. 1, 2012) at 11. The first time she spoke over counsel, the trial court admonished her to not answer counsel before he had completed his question. The second time she spoke over counsel, the trial court sanctioned her $50 and warned her he would sanction her again if she continued to interrupt. The third time she spoke over counsel, the trial court sanctioned her another $50. The trial court also sanctioned Melissa, who was pro se, $50 for "interrupting" Enriquez when he was responding to one of her questions. RP (Aug. 1, 2012) at 31.

[7] The trial court appears to have sanctioned James's counsel $50 for "arguing" with Melissa during his cross-examination of her. RP (Aug. 1, 2012) at 19.

the child was adapting to living with her father and his fiancée, (2) the stability of Melissa's new job, housing, and relationship with Enriquez, (3) Enriquez's supervised visitation with his own child, and (4) facts related to the alleged assault.

The trial court gave the following extensive oral ruling:

You know usually when you listen to these kind of cases, hopefully they're always very clear. For want of a better term, one person is a jerk and one person is a very nice person, it makes it very easy, or both of them are very nice people and it makes the job very hard. Or this is one of those cases, for want of a better term, the Court has to make a decision of the lesser of two evils.

Let's go back and take a look at what we've got here. And I'm not going to go too far in the past. I must say, having listened to the McCleary trial and Mr. Enriquez and obviously court files is aware of his situation, and all of the materials that the parties have stipulated the Court could entertain, so we didn't have to revisit these issues again of the testimony of the parties in this case. I'll just synopsize it very simply.

The lifestyle of McCleary is somewhat different than what I had suspected having grown up here. I didn't know that things were quite as extravagant, shall we say. And I will further say it's not a lifestyle that I approve of. But where are we today? We are in the situation where we have a mother and father of this child and the mother is asking that she be allowed to relocate the child to Manchester or basically Kitsap County, which is some distance up the road but not that far up the road from . . . McCleary, Washington. . . .

The bottom line is the mother wishes to relocate, she obtained new employment in May of 2012, appears to be a good job, whatever. The father, still employed, basically unemployed but employed in his job, and I think we can all quit pointing fingers about today's economy. Anybody who doesn't know what's happening in this country since October of 2008 and jobs in America needs to have their head examined then.

The bottom line is let's take a look at the child. Basically born and raised in McCleary, goes to school in McCleary, lived their entire life, et cetera, and it changes, the mother moving, the father not moving, despite each is with a different significant other. The father apparently with a significant other for one year, [Melissa] with a significant other for apparently more than one year, which is relevant at times but not relevant. *The question is the child, that's what we're here for.*

Now, let's take a look at some of these materials. When you come into a courtroom I think probably the most important thing and I will tell you people, like I've told mainly criminal people, you know candor and honesty is the most important factor. And I say it with tongue in cheek, but not tongue in cheek, I've told people that committed murder with the weapon in your hand and the blood

8

dripping down from your arm, I would rather have you sit there and tell me what you did than sit there and tell me that I didn't do it, I don't know. Let's get serious about it, because I can deal with a person who's going to be honest with me. I can't deal with a person who's going to be dishonest with me, I don't know where we're coming from.

Now, *one of the major issues in this case to me is candor and honesty.* In this case, if I take a look at it, there was a parenting plan entered in June. And *in my opinion you were not honest with the Court, [Melissa].* You came in, you agreed to a parenting plan, et cetera, and you knew you already had a job elsewhere. *You knew you weren't going to be living in McCleary, you knew you were going up the road.* So I can only conclude you misled the opposing party, you misled the attorneys. . . . And once that parenting plan was entered, then you went down the road to go behind everyone's back and change things. It's not honest.

*When I look at candor and honesty here, too, it's rather startling and, fortunately or unfortunately, in the trial what we had involving Mr. Enriquez* - in fact, there were two trials, hung jury in October on an assault charge. And just briefly, the facts of the case involve Mr. Enriquez and [James] and we've got an issue - in fact, the issue involves something about did or did not drink a beer around a kid on a birthday and went up to Olympia and Costco and birthday and all the rest of this situation and came back. And there was some apparently words or whatever and that culminated in these two - use the term lightly - gentlemen meeting at the McCleary. And we focus on the police station.

. . . .

But I know where that intersection is, I know where the ballfield is, I know what the Bear Festival is. It's not like I'm an idiot there. . . . We're not talking about a large metropolitan city.

And on that evening, which is rather interesting, a call is made, I'll meet you 10:30, basically let's go up there and have a chat. And I heard two versions at the trial, the first one was it was a nice friendly chat, the second one was it wasn't a nice friendly chat. *But I do know one thing, one of the guys showed up with a loaded gun with a bullet in the chamber.* I happen to know a little bit about guns. I didn't like the Mekong Delta and it was very fortunate that I was very familiar with pistols, M16's, BAR's, 50 caliber machine guns. Very familiar with them. And I'm also familiar with you don't walk around with a bullet in the chamber of a gun. In fact, anybody whose [sic] had a revolver, you've got six rounds, you always only put five in. The hammer is always over an empty chamber. Why? Goes off and you drop it, it's hit, it's got a problem. Read the papers. It happens with semiautomatics, too. We never jacked bullets into chambers unless we were going to use them.

But let's come forward then. *Let's go back to candor and honesty.* We had a hearing on this initially on August 1 of 2012. *At that hearing Mr. Enriquez was called to the stand. Very interestingly he refused to give his address.* He was asked his address and he refused. Mmmm. Very interestingly we had a Court hearing in that case on September 24th. The morning hearing had to be continued to the

afternoon. The Court was informed that at about 10 or 11 o'clock, whatever time it was, that Mr. Enriquez was in Shelton and he would be there as quickly as he could. But wait a minute, his address is Lynnwood, Washington. I don't know very many people that take a ferry across Puget Sound to drive down a Highway 103 to come through Shelton to get to this Court from Lynnwood, Washington. The fastest way is to drive down I-5 and turn off the route over here, *so maybe someone wasn't living where they were supposed to by Court order. Maybe someone wasn't being honest with the Court.*

And then, wait a minute, [Melissa] has testified that she lives in Manchester. She lives in basically the basement of Mr. Enriquez's mother's home in Manchester or Port Orchard, call it what you wish. Yet Document 55 on the witness list in the criminal trial lists her address as Lynnwood, Washington. That's the address that was given by Mr. Enriquez's attorney to the Court of where she lived. *So I don't know, the lawyer misled the Court or she misled the Court. Somebody misled the Court.*

But the inference here is apparently these two people have obviously - *as indicated in inference to the Court, they've been together basically all of this time.* I can only infer - and maybe the lawyer made a mistake --

. . . .

. . . *-- Enriquez was not honest with the Court.* I have to go back, he wouldn't tell the Court where he lived.

Then we go down this situation - and I have to take a look at the overall. *And I know also in this situation Mr. Enriquez's parenting plan, he's not even allowed to have unsupervised visits with his own children.* He has two hours per week visitation with his children that must be supervised and he is to undergo an alcohol evaluation. I have not had any information or testimony to this Court in this proceeding of whether or not he has, whether he hasn't, outside of I know that the gentleman that lives with you is not allowed around his own kids unsupervised.

And then we get around to something I think that's very telling also. It goes back to the kickoff point in this. And I believe we've already heard the testimony at the trials. I agree with you, [Melissa], *the jury found Mr. Enriquez not guilty. There's no question about that. There's an interesting parable. Not guilty doesn't mean innocent.* The two are not synonymous terms. It's quite obvious that if you recall from this trial that jury was also sent back and asked the question and it had to do with a significant amount of money and that would have been the award of attorney's fees and costs which included time loss and things of that nature.

Was Mr. Enriquez justified in his use of force that evening? That very same jury that found him not guilty came back and said, no, it wasn't. So the gentleman who showed up on that night to resolve a parenting issue with a loaded gun, bullet in the chamber, was not justified in the use of his force that night and the very same jury that found him not guilty made that.

*So let's get back to square one. I've got a parenting plan and a request. One, yeah, you misled the Court off the bat. Okay.* We all make mistakes. It's not like you're innocent. It's like I started this off, [James], this is the lesser of two

10

evils. I'm not going to go back and revisit because I've told both of you what happened up to the date you signed that parenting plan, courts are restricted.

So I guess I'm not going to go down your lifestyle and how you conducted yourself and all the other stuff that's been presented. *My decision is based on basically two things; Number 1, stability. This child was born and raised in McCleary. She goes to the same school, has the same friends. . . . That's where she's going to keep going to school. I am not going to change the program to allow this child to be relocated to a strange community to live in the basement of Mr. Enriquez's home. And he is not going to be allowed around that child . . . unless you are present until further order. If he can't be allowed by a Court to be around his own kids, it would be highly remiss of this Court to do otherwise.*

Now, regarding that. If it happens, they come back, I don't know, I'll cross that bridge when I get to it. *So the stability of the child is my first criteria. My second criteria is honesty with the Court.* And you weren't. And so therefore, it is I believe *in the best interest of this child* to continue to reside with his - with her father.

I'm also going to say she gets liberal visitation . . . and it's going to be worked around her work schedule. And I will caution you, until there's a further court order that child is not to be left in the presence alone with Mr. Enriquez.

. . . .

. . . If his mother is there, that's fine, go to the store and do your thing. But I'm not going to find myself looking in the mirror until some Court lifts that order on him and then we can cross that bridge. And I'll tell you right now, you can save your attorney's fees. And you better listen very closely. About the time that that kid or his children are allowed to have unsupervised visitation, then I'm not going to have that requirement in there. But I will have one requirement, there's going to be no firearms around that kid. If that kid comes over to visit, the firearms are to be locked up, period.

Now, outside of that, that's how it's going to be. And I would caution you very closely the word liberal means liberal. She's out working, she's got a good job, a potential good career, and it[']s not too far down the road and that kid is not going to be living with either one of you, hopefully she'll be in college. And I would rather have her working at a good career contributing to college tuition than not, and you also.

RP (Jan. 30, 2013) at 64-75 (emphasis added).

The trial court did not issue written findings of fact and conclusions of law. On April 8, 2013, the trial court entered the final parenting plan, designating James as the primary residential parent and allowing Melissa visitation.

Melissa appeals the denial of her motion to relocate and the modified parenting plan.

ANALYSIS

I. RELOCATION

Melissa first argues that the trial court erred when it denied her request for relocation without addressing the child relocation factors in RCW 26.09.520. We agree.

A. STANDARD OF REVIEW

We review the trial court's decision on a request to relocate for abuse of discretion. *In re Marriage of Horner*, 151 Wn.2d 884, 893, 93 P.3d 124 (2004); *In re Marriage of Fahey*, 164 Wn. App. 42, 61, 262 P.3d 128 (2011). The trial court abuses its discretion when it applies an incorrect standard, the record does not support the court's findings, or the facts do not meet the requirements of the correct standard. *Horner*, 151 Wn.2d at 894.

B. CHILD RELOCATION STANDARDS AND FACTORS

RCW 26.09.520 provides the legal standard for determining a relocation issue. *Horner*, 151 Wn.2d at 895. RCW 26.09.520 provides,

> The person proposing to relocate with the child shall provide his or her reasons for the intended relocation. There is a *rebuttable presumption* that the intended relocation of the child will be permitted. A person entitled to object to the intended relocation of the child *may rebut the presumption by demonstrating that the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person, based upon the following factors.* The factors listed in this section are not weighted. No inference is to be drawn from the order in which the following factors are listed:
>     (1)  The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
>     (2)  Prior agreements of the parties;
>     (3)  Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;
>     (4)  Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;

12

(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;

(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;

(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;

(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;

(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;

(10) The financial impact and logistics of the relocation or its prevention; and

(11) For a temporary order, the amount of time before a final decision can be made at trial.

(Emphasis added.)

## C. ABUSE OF DISCRETION

When we consider whether a trial court abused its discretion in deciding a request for relocation, we first determine whether the trial court entered specific findings on each factor. *Horner*, 151 Wn.2d at 896. If the trial court did not enter these findings, we examine the record to determine whether substantial evidence was presented on each factor and whether the "trial court's findings of fact and oral articulations reflect that it considered each factor." *Horner*, 151 Wn.2d at 896. If the trial court does not satisfy either of these methods of documenting its consideration of the child relocation factors, the trial court has abused its discretion. *Horner*, 151 Wn.2d at 896. Such is the case here.

Here, the trial court did not enter any written findings of fact. Additionally, the trial court's oral ruling failed to address several of the child relocation factors. The trial court expressly stated that it was basing its decision entirely on two factors: (1) "stability [of the child]," and (2) "honesty with the [c]ourt." RP (Jan. 30, 2013) at 73. These factors arguably touch on aspects of the first

13

factor ("[t]he relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life"), and aspects of the fifth factor ("[t]he reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation"). RCW 26.09.520 (1), (5). But they do not address the remaining factors.

James argues that the oral ruling was sufficient to show the court considered all remaining relevant factors; we disagree. For instance, the oral ruling did not address the third factor, whether disrupting contact between the child and Melissa would be more detrimental to the child than disrupting contact with James. RCW 26.09.520(3). Although the trial court addressed the potential risk to the child by placing her in a situation with someone who was apparently prohibited from unsupervised contact with his own child and who had been around children with a loaded firearm, it at no time mentioned whether disrupting the child's contact with Melissa would be more or less detrimental than disrupting the child's contact with James. RCW 26.09.520(3).

And although the trial court acknowledged, to some extent, that Melissa's pursuit of her new career could be financially beneficial to the child later, the court never discussed the seventh factor, the quality of life, resources, or opportunities that might be available to the child in the new location versus those available to her in McCleary. RCW 26.09.520(7). Nor did the trial court mention anything that remotely touched on the eighth factor, whether there were alternative arrangements that might foster and continue the child's relationships with both parents, such as providing more frequent weekend visitation with James or the possibility that Melissa consider moving to a location somewhat further from work but closer to McCleary, or the ninth factor,

14

No. 45042-9-II

alternatives to Melissa's relocation and whether it was feasible or desirable for James to relocate. RCW 26.09.520(8), (9).

Moreover, the trial court ignored the presumption in favor of relocation, which should have been in Melissa's favor because she was the primary residential parent under the June 2012 parenting plan, and instead relied on a "best interest" of the child standard rather than balancing whether the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person. *See* RP (Jan. 30, 2013) at 73 ("And so therefore, it is I believe in the *best interest* of this child to continue to reside with his - with her father.") (emphasis added); RCW 26.09.520.

Because the trial court failed to address each of the relevant factors, failed to acknowledge the presumption in favor of relocation, and applied the incorrect legal standard, it abused its discretion. Accordingly, we reverse its denial of Melissa's relocation request and remand for a new hearing on this matter.

## II. MODIFICATION

Melissa next argues that the trial court erred in modifying the June 2012 parenting plan to change the primary residential parent designation without a proper adequate cause finding following its denial of the relocation motion. James argues that when a party pursues relocation, the trial court has the authority to modify the parenting plan without an adequate cause finding. Because we vacate the denial of the relocation motion, we also vacate the April 2013 modified parenting plan and reinstate the original June 2012 parenting plan pending further proceedings.

RCW 26.09.260(6) governs parenting plan modifications based on relocation. That statute provides,

15

The court may order adjustments to the residential aspects of a parenting plan pursuant to a proceeding to permit or restrain a relocation of the child. The person objecting to the relocation of the child or the relocating person's proposed revised residential schedule may file a petition to modify the parenting plan, including a change of the residence in which the child resides the majority of the time, without a showing of adequate cause other than the proposed relocation itself. A hearing to determine adequate cause for modification shall not be required so long as the request for relocation of the child is being pursued. In making a determination of a modification pursuant to relocation of the child, *the court shall first determine whether to permit or restrain the relocation* of the child using the procedures and standards provided in RCW 26.09.405 through 26.09.560. *Following that determination*, the court shall determine what modification pursuant to relocation should be made, if any, to the parenting plan or custody order or visitation order.

RCW 26.09.260(6) (emphasis added).

James is correct that he did not have to establish adequate cause for modification as long as the request for relocation is being pursued. RCW 26.09.260(6). But the remainder of subsection (6) makes it clear that any modification must *follow* the trial court's determination of whether to permit or restrain the child's relocation. Because the trial court's modification of the June 2012 parenting plan was pursuant to its denial of Melissa's relocation request and we are vacating that decision and remanding for a new determination on the relocation issue, the trial court's order modifying the June 2012 parenting plan is also vacated and remanded for further action.

III. ATTORNEY FEES AND COSTS

James requests attorney fees and costs citing RCW 26.09.140, RAP 18.1, *Leslie v. Verhey*, 90 Wn. App. 796, 807, 954 P.2d 330 (1998) (the court should examine the arguable merit of the issues raised on appeal when determining if attorney fees and costs are appropriate). Because Melissa's appeal had merit, we deny James's request for attorney fees and costs.

16

We vacate the trial court's denial of Melissa's request for relocation and the April 8, 2013 modified final parenting plan and remand for further proceedings before a different judge.[8]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J.

We concur:

BJORGEN, J.

MELNICK, J.

---

[8] We remand to a different judge because the original judge has retired and the record strongly suggests that the judge would have difficulty overlooking his previously stated views or findings. A remand to a new judge would prevent any possible appearance of impropriety, and the remand essentially requires a new hearing in light of the time that has passed since the judge denied Melissa's relocation, thus the reassignment would not entail a disproportional amount of additional resources. *Ellis v. United States Dist. Court*, 356 F.3d 1198, 1211 (9th Cir. 2004).