# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Marriage of )
)                    No. 76403-9-I
ERIN D. FARRELL-MILOSAVLJEVIC, )
)                    DIVISION ONE
           Respondent, )
)                    UNPUBLISHED OPINION
           and )
)
ZMAJKO MILOSAVLJEVIC, )
)
           Appellant. )      FILED: July 16, 2018

TRICKEY, J. — Zmajko Milosavljevic and Erin Farrell-Milosavljevic (Farrell) had a contentious dissolution of their marriage. After several days of trial, the court issued a permanent parenting plan allowing Farrell to relocate to Toronto, Ontario, Canada with the children and restricting Milosavljevic's contact with the children due to abusive use of conflict and parental alienation. The trial court committed numerous errors in establishing the permanent parenting plan and the financial obligations. Therefore, we reverse and remand for a new trial.

## FACTS

Milosavljevic and Farrell met in 2000. Farrell was a law student working in Notre Dame's immigration law clinic. Milosavljevic was a Serbian refugee seeking political asylum. They moved to New Jersey so that Farrell could work as an immigration lawyer.

They married in October 2000. Their son, Z.M., was born in 2002. The family moved several times for Farrell's employment. Their daughter, S.M., was

born in Massachusetts in 2006. Milosavljevic primarily cared for the children and the family's home, while Farrell worked at a law firm. He started his own carpentry business in Massachusetts.

In 2009, the family relocated to Washington so that Farrell could work as an immigration lawyer with Microsoft. Milosavljevic was forced to close his carpentry business. Farrell's early years at Microsoft were "grueling," and she worked extremely long hours.[1] Milosavljevic took care of the children and managed the family's home. He was the primary caregiver between 2009 and 2012, including driving the children to school and activities. In 2012, Milosavljevic began working as a field carpenter for a construction firm.

Farrell made all the decisions concerning the children's education, mostly without consulting Milosavljevic. These decisions included sending Z.M. and S.M. to private schools. Both Z.M. and S.M. were diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and struggled in school. Z.M.'s ADHD and whether to medicate him became a significant point of contention between Milosavljevic and Farrell, and Farrell and Z.M.

In mid-2012, Milosavljevic and Farrell's marriage began to deteriorate. Farrell filed for dissolution of the marriage in June 2015. The trial court issued a temporary order, which required Farrell to pay $1,000 in monthly maintenance to Milosavljevic. The trial court also issued a temporary parenting plan under which the children would reside with Farrell, and Milosavljevic would have them for

---

[1] Ex. 322 at 14; Report of Proceedings (RP) (Dec. 21, 2016) at 588.

overnights on Wednesdays and every other weekend. Farrell obtained a temporary restraining order against Milosavljevic.

Milosavljevic and Farrell both alleged that the other suffered from mental health issues and had committed domestic violence. The trial court appointed a Guardian Ad Litem (GAL) to investigate and report on all issues relating to the development of a permanent parenting plan. The court also ordered the GAL to inquire into the allegations of domestic violence and mental health issues against both Farrell and Milosavljevic, as well as Milosavljevic's substance abuse, abusive use of conflict, and refusal to seek needed services for the children.

In November 2015, the GAL issued her first report which noted the complexity of the case. During her investigation, the GAL found insufficient evidence to restrict Milosavljevic's time with the children based on substance abuse, but recommended that he undergo a chemical dependency evaluation.

She found that Milosavljevic's allegations of domestic violence against Farrell were not credible. She identified isolated incidents of Milosavljevic using physical violence and his frequent loss of temper but was not concerned about physical harm to the children. She thought Milosavljevic's anger issues should be addressed as a mental health or abusive use of conflict concern.

The GAL also investigated both Farrell's and Milosavljevic's mental health. She found that Farrell had been diagnosed with depression and ADHD, which were adequately addressed through medication and therapy. She encountered variable information about Milosavljevic's mental health. His current therapist opined that Milosavljevic had an adjustment disorder that was well managed. An earlier

therapist alleged that Milosavljevic suffered from significant personality disorders and posed a risk of harm to himself or others.[2] The GAL believed the prior therapist's claims were exaggerated but recommended a psychological evaluation to resolve the inconsistent opinions.

Finally, the GAL explored Milosavljevic's alleged abusive use of conflict and parental alienation. Specifically, the GAL stated that Milosavljevic had "engaged . . . in a campaign to turn [Z.M] against [Farrell], in a manner that could have long-term damaging effects on [Z.M.'s] psychological and emotional development, and his relationship with [Farrell]."[3] The GAL opined that some of Z.M.'s preferences for Milosavljevic were due to neutral factors, such as a teenage boy's tendency to seek out his father, Farrell's unavailability due to long work hours, and a general preference for Milosavljevic's parenting style. But Milosavljevic's behavior reinforced those factors. The GAL also found that Z.M. was too involved in the conflict between his parents. Additionally, Milosavljevic and Z.M. openly spoke negatively about Farrell, which in turn negatively impacted S.M.

As a result of Milosavljevic's behavior, the GAL recommended that his contact with the children be restricted until a neutral psychological evaluation was conducted. She also recommended counseling for the children and Milosavljevic in order to address Z.M.'s alienation from Farrell. Significantly, the GAL also

---

[2] Dr. Thomas Carter was originally Milosavljevic's therapist. He then began counseling Milosavljevic and Farrell together. Eventually, he became Farrell's individual therapist and no longer treated Milosavljevic. He provided a letter to the trial court that alleged that Milosavljevic suffered from significant mental health issues and committed domestic violence. In her second report, the GAL noted that "[i]t is unfortunate that many of the mental health issues were clouded by the involvement of Dr. Carter, who has aligned with [Farrell] and contributed to the conflict between the parties." Ex. 339 at 38.
[3] Clerk's Papers (CP) at 73.

recommended that the "final parenting plan" restrict Milosavljevic's contact with the children due to his abusive use of conflict.[4]

Subsequently, the court issued a temporary parenting plan implementing the GAL's recommendations by replacing Milosavljevic's residential time with four supervised visits. After these four visits, his residential time would resume. In addition, the trial court ordered Milosavljevic to undergo a psychological evaluation.

In April 2016, Dr. Marnee Milner conducted Milosavljevic's psychological evaluation and submitted a report of her conclusions. She concluded that Milosavljevic suffered from an adjustment disorder and mild ADHD, but did not exhibit the severe personality disorders alleged by his previous therapist. Dr. Milner noted that Milosavljevic could have problems with impulsivity, poor decision-making, and insight into his own emotional and psychological well-being. She also opined that Milosavljevic's perception that Farrell had been emotionally and financially abusive could indicate delusions about the relationship that would make him quick to speak negatively about Farrell.

In May 2016, before the dissolution trial then set in July, Farrell obtained employment in Toronto, Ontario, Canada and petitioned the trial court to allow Z.M. and S.M. to relocate with her. Milosavljevic objected to the relocation. Neither Z.M. nor S.M. wanted to leave Seattle. The trial court issued temporary orders allowing the children to reside with Milosavljevic while Farrell moved to Toronto. The court continued the trial date to October and then to December.

---

[4] CP at 18.

The GAL submitted a second report in July 2016.[5] She did not find any reasons to restrict Milosavljevic's contact with the children based on substance abuse, domestic violence, or mental health concerns. She no longer recommended restrictions against Milosavljevic due to his abusive use of conflict. She noted that Milosavljevic had "gained some skills in this area" with parent coaching and therapy.[6] She also acknowledged many positive aspects of Milosavljevic's relationship with Z.M. and that it was natural for a boy of Z.M.'s age to gravitate toward his father.

The GAL did find, however, that Milosavljevic continued to engage in abusive use of conflict and parental alienation. The GAL opined, "[T]he relationship between [Z.M.] and [Farrell] continues to deteriorate in an unhealthy manner. [Milosavljevic] is not solely to blame, of course, but his allowing [Z.M.] to continue to 'tattle' on [Farrell] contributes to [Z.M.'s] rejection of her."[7]

The GAL also addressed Farrell's relocation in the second report. She mentioned Milosavljevic's abusive use of conflict in her analysis of the statutory factors governing child relocation that consider whether either parent is subject to restrictions on contact with the children. The GAL wrote, "[a]s noted in the earlier report, there should be a finding of abusive use of conflict against [Milosavljevic], based on parental alienation."[8] But she also opined that Z.M.'s relationship with Farrell had deteriorated due to both natural factors and Milosavljevic's influence.

---

[5] The second report was titled the "FINAL GAL REPORT." CP at 242.
[6] CP at 284.
[7] CP at 284.
[8] CP at 286.

After weighing the statutory factors, the GAL concluded that S.M. should relocate to Toronto with Farrell, while Z.M. should remain in Washington with Milosavljevic. The GAL noted that "[t]he relationship between [Farrell] and [Z.M.] has deteriorated to the point where it is not in [Z.M.'s] best interest to relocate with [Farrell] at this time."[9] The GAL concluded that "[g]iven their ages and the complex relationship between [Z.M.] and his parents, it is hoped that allowing each child to develop healthy relationships with both parents without the conflict that has arisen between [Z.M.] and [Farrell] will support their well-being."[10]

Pending trial and entry of the permanent parenting plan, the children remained in Washington and lived with Milosavljevic. In December 2016, the GAL met with Z.M. and S.M. and submitted a supplemental third report the trial court had ordered. The GAL found that S.M. had adjusted well to being in Milosavljevic's primary care and had benefitted from spending time with Milosavljevic and Z.M. But S.M. had begun to withdraw from Farrell, and the GAL remarked that S.M. had absorbed some of Milosavljevic's arguments against Farrell. During the meeting, S.M. independently expressed her desire to stay in Washington.

The GAL found that Z.M. still held negative views of Farrell, focusing on her perceived faults and her role in the dissolution. Z.M. had not made any effort to reconcile their relationship. The GAL expressed significant concern about Z.M.'s ability to cope if he were "'forced'" to relocate with Farrell.[11] The GAL specifically noted that "all the blame for [Z.M.'s] rejection of [Farrell] should not be placed on

---

[9] CP at 286.
[10] CP at 288.
[11] CP at 528.

7

[Milosavljevic], but he should accept some responsibility for his alienating behaviors."[12] The GAL again recommended that Z.M. remain in Washington with Milosavljevic, and that S.M. relocate to Toronto with Farrell.

The parties' dissolution trial took place over several days in late December 2016. The GAL was one of the witnesses who testified. The court ordered that S.M. and Z.M. relocate to Toronto with Farrell. In oral remarks, the trial court stated that this decision would enable the children to have a positive relationship with both Farrell and Milosavljevic. The trial court believed that Farrell was more likely to ensure that both parents had a positive relationship with the children. The court stated, "I just made the decision that I think that the mother is the one that is more capable, more likely, more willing to do that."[13]

The trial court also restricted Milosavljevic's contact with the children based on his abusive use of conflict and "long term pattern of alienation of the children, causing damage to their relationship with [Farrell]."[14] The court appointed a case manager to establish and enforce communication guidelines between Milosavljevic and the children. The court directed the case manager to make and implement recommendations as to the appropriate residential schedule for the children, subject to the trial court's review.

The trial court ordered Milosavljevic to pay $836.20 in monthly child support and 32 percent of additional expenses, including uninsured medical expenses, day care, private school tuition and tutoring, flights for visitation, and extracurricular

---

[12] CP at 527.
[13] RP (Dec. 23, 2016) at 890.
[14] CP at 406.

8

activities. Farrell was responsible for the remaining 68 percent of these additional expenses. The trial court denied Milosavljevic's request for maintenance. Farrell received a restraining order for one year against Milosavljevic.

Milosavljevic appeals.

## ANALYSIS

### Parenting Plan

Milosavljevic argues that the trial court erred by addressing the child relocation act (CRA), RCW 26.09.405-.560, factors without applying the best interests of the child factors and establishing a permanent parenting plan under RCW 26.09.187. Farrell responds that the trial court properly applied the correct legal standard to the relocation issue.[15]

The trial court must fashion a permanent parenting plan that includes a residential provision that encourages each parent to maintain a loving, stable, and nurturing relationship with the child. RCW 26.09.187(3)(a). In order to achieve this, the trial court considers the best interests of the child to determine and allocate parenting responsibilities between the parties. In re Marriage of Possinger, 105

---

[15] Farrell also argues that Milosavljevic agreed to the application of the CRA in the case and cannot raise this issue for the first time on appeal. See RAP 2.5(a). Farrell's claim that Milosavljevic agreed to the application of the CRA does not accurately describe his position. During a discussion with the trial court, Milosavljevic noted that "there hasn't been a prior determination as to who the primary parent was because the parties weren't divorced, and the Relocation Act more or less contemplates that there's already been a determination as to who the primary parent is." RP (Dec. 22, 2016) at 793. The trial court stated that the CRA applied to any parenting plan, whether temporary or permanent. Milosavljevic was not comfortable with this conclusion because he felt the temporary parenting plan was improperly decided. Thus, Milosavljevic expressed concern about the trial court's premature application of the CRA at the time of the dissolution proceedings. Therefore, the issue is properly raised on appeal. See Lunsford v. Saberhagen Holdings, Inc., 139 Wn. App. 334, 338, 160 P.3d 1089 (2007), aff'd, 166 Wn.2d 264, 208 P.3d 1092 (2009).

Wn. App. 326, 335, 19 P.3d 1109 (2001). The best interests of the child are analyzed through the seven factors the trial court must consider when establishing a residential schedule. RCW 26.09.187(3)(a)(i)-(vii).[16] The trial court must make a residential placement decision that advances the best interests of the child after considering the factors found in RCW 26.09.187(3). In re Parentage of J.H., 112 Wn. App. 486, 492-93, 49 P.3d 154 (2002).

A child's residential time with a parent must be limited when the parent's conduct meets certain statutorily defined circumstances due to adverse effects on the child. RCW 26.09.191(2). In other situations, the trial court has the discretion to impose limitations. RCW 26.09.191(3). A child's residential schedule must be consistent with restrictions imposed under RCW 26.09.191. RCW 26.09.187(3)(a). Limitations imposed under RCW 26.09.191 may be dispositive of a child's residential schedule. RCW 26.09.187(3)(b).

---

[16] The seven factors of RCW 26.09.187(3)(a) are

(i) The relative strength, nature, and stability of the child's relationship with each parent;

(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii) Each parent's past and potential for future performance of parenting functions as defined in [RCW 26.09.004(3)], including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;

(iv) The emotional needs and developmental level of the child;

(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

10

Under the CRA, when residential time is shared between parents, the parent with whom the child resides the majority of the time must provide notice of any intention to relocate. RCW 26.09.430. When there is no parenting plan in place, with whom the child principally resides is a question of fact. In re Marriage of Fahey, 164 Wn. App. 42, 57, 262 P.3d 128 (2011).

If the non-relocating party objects, the trial court must consider eleven factors to determine whether to permit the proposed relocation. RCW 26.09.520.[17] "The CRA shifts the analysis away from only the best interests of the child to an analysis that focuses on both the child and the relocating person.'" In re Marriage

---

[17] The eleven factors of RCW 26.09.520 are
> (1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
> (2) Prior agreements of the parties;
> (3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;
> (4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;
> (5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;
> (6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;
> (7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;
> (8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;
> (9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;
> (10) The financial impact and logistics of the relocation or its prevention; and
> (11) For a temporary order, the amount of time before a final decision can be made at trial.

11

of McNaught, 189 Wn. App. 545, 553, 359 P.3d 811 (2015) (quoting In re Marriage of Horner, 151 Wn.2d 884, 887, 93 P.3d 124 (2004)). The CRA presumes that the intended relocation of the child will be permitted. RCW 26.09.520. "A person entitled to object to the intended relocation of the child may rebut the presumption by demonstrating that the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person, based upon the [eleven] factors." RCW 26.09.520. The trial court has the discretion to grant or deny a relocation after considering the relocation factors and the interests of the children and their parents. Fahey, 164 Wn. App. at 56-57.

The CRA applies when the person with whom the child resides a majority of the time wants to relocate. RCW 26.09.520. As such, the CRA assumes that the parties have a residential schedule in place that establishes the parent with whom the child resides a majority of the time. This residential schedule is part of the permanent parenting plan determined through consideration of the best interests of the child.[18] RCW 26.09.187. Therefore, the CRA factors are generally assessed after the best interest of the child factors have been applied and the residential schedule is in place.

During an ongoing dissolution proceeding, a trial court may be required to determine the permanent parenting plan and whether relocation is appropriate at the same time. When establishing the permanent parenting plan, the trial court

---

[18] We note that a residential schedule in a temporary parenting plan is also subject to the CRA. RCW 26.09.410(1). When establishing a temporary parenting plan, the trial court considers the best interests of the child factors to determine residential provisions. RCW 26.09.197. Therefore, the CRA factors would apply after the best interest factors have been considered for a residential schedule under a temporary parenting plan.

12

may not draw presumptions from the temporary parenting plan. RCW 26.09.191(5). As a result, the parent with the majority of the residential time is not defined by the temporary parenting plan in later proceedings.

Until a parent with whom the child resides a majority of the time is identified, the CRA factors do not apply. This parent is identified by the residential schedule in the parenting plan or through factual inquiry if required. See Fahey, 164 Wn. App. at 57. Therefore, when the permanent parenting plan and relocation are determined in the same proceeding, the trial court must first establish a parenting plan and residential schedule before turning to a CRA analysis.

While establishing the residential schedule in a permanent parenting plan generally requires consideration of the best interests of the child factors, RCW 26.09.191 restrictions may be dispositive of the child's residence without examination of the best interests of the child factors. RCW 26.09.187(3)(a). In such cases, the RCW 26.09.187(3) best interests of the child factors are essentially unnecessary and the trial court may proceed directly to consideration of the CRA factors under RCW 26.09.520.

In this case, the trial court imposed discretionary RCW 26.09.191(3) restrictions on Milosavljevic's contact with Z.M. and S.M. If properly imposed, these restrictions are dispositive of Farrell's role as the parent with whom the children principally reside. Based on the above analysis, the trial court's examination of the CRA factors without first addressing the child's best interests was not legal error if the RCW 26.09.191(3) limitations were properly imposed on Milosavljevic's contact with the children.

13

Discretionary limitations may be imposed for abusive use of conflict "which creates the danger of serious damage to the child's psychological development." RCW 26.09.191(3)(e). Restrictions may also be imposed for other factors or conduct that "the court expressly finds averse to the best interests of the child." RCW 26.09.191(3)(g). Before imposing restrictions under RCW 26.09.191(3)(g), the trial court must find "'more than normal . . . hardships which predictably result from a dissolution of marriage.'" In re Marriage of Katare, 175 Wn.2d 23, 36, 283 P.3d 546 (2012) (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 55, 940 P.2d 1362 (1997)). The court may impose restrictions only where substantial evidence shows the existence of a danger of damage. In re Marriage of Chandola, 180 Wn.2d 632, 645, 327 P.3d 644 (2014). The restrictions must be reasonably calculated to prevent the kind of harm involved. Chandola, 180 Wn.2d at 653. Restrictions are reviewed for abuse of discretion. See Chandola 180 Wn.2d at 642-43.

A trial court's parenting plan is also reviewed for abuse of discretion, which occurs when a decision is manifestly unreasonably or based on untenable grounds or untenable reasons. Chandola, 180 Wn.2d at 642. The trial court's findings of fact are treated as verities on appeal, as long as they are supported by substantial evidence. Chandola, 180 Wn.2d at 642. "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted." Chandola, 180 Wn.2d at 642. The appellate court reviews errors of law de novo. Fahey, 164 Wn. App. at 55.

14

Here, the trial court included restrictions on Milosavljevic's contact with his children based on RCW 26.09.191(3)(e) for abusive use of conduct, and RCW 26.09.191(3)(g) for a long term pattern of alienation of the children, causing damage to their relationship with Farrell. In establishing these restrictions the court stated, "[Milosavljevic] acts and speaks loudly and in a demanding manner to and regarding [Farrell], and undermines and alienates the children from their mother, which interferes with any reasonable expectation that the parties can engage in joint decision making."[19] Additionally, the trial court noted, "[Milosavljevic] has engaged in undermining [Farrell's] parenting resulting in alienation of the children."[20] The trial court cited the GAL's recommendation as the reasoning behind the RCW 26.09.191(3) restrictions, finding, "[t]he GAL has recommended restrictions against [Milosavljevic] throughout this action due to his abusive use of conflict which has caused serious damage to the children's psychological development, plus his behavior of undermining [Farrell]."[21]

The trial court cited the GAL's recommendation of restrictions in the first report and adopted those restrictions. However, the court failed to acknowledge that the GAL, in her two subsequent reports and her trial testimony, did not renew this recommendation. In fact, the GAL recommended that Z.M. remain in Washington with Milosavljevic rather than relocate to Toronto. The recommendation that Z.M. reside with Milosavljevic fundamentally conflicts with a recommendation of restrictions under RCW 26.09.191(3).

---

[19] CP at 383.
[20] CP at 383.
[21] CP at 385.

15

The GAL clearly states that Milosavljevic played an undeniable role in undermining the relationship between Z.M. and Farrell. But the GAL also noted that benign, developmental reasons contributed to the schism between Z.M. and Farrell. Moreover, the GAL found that Milosavljevic's behavior improved over time. By her second report, the GAL noted that Milosavljevic still engaged in abusive use of conflict but did not renew her explicit recommendation for restrictions.

Therefore, the GAL's reports do not support the trial court's imposition of restrictions under RCW 26.09.191(3).

The trial court relied solely on the GAL's initial reports to impose restrictions on Milosavljevic. The trial court did not cite other evidence or make additional findings to support restrictions on Milosavljevic's contact with his children. As a result, the trial court's determination that restrictions were required was not supported by substantial evidence. The restrictions were imposed on untenable grounds and amount to an abuse of the trial court's discretion.

The trial court determined the parenting plan and residential schedule based on these improperly imposed RCW 26.09.191(3) restrictions. This resulted in legal error. Because the record does not support restrictions that effectively determine residence, the trial court was required to assess the best interests of the children to formulate the residential schedule for the permanent parenting plan. Only after arriving at a permanent parenting plan and establishing the parent with the majority of the residential time can the court consider the CRA factors.

In addition to premature application of the CRA factors, the trial court improperly applied the friendly parent concept to decide relocation and establish

16

the permanent parenting plan. "Under the 'friendly parent' concept, primary residential placement is awarded to the parent most likely to foster the child's relationship with the other parent." In re Marriage of Lawrence, 105 Wn. App. 683, 687, 20 P.3d 972 (2001). Washington law does not recognize the friendly parent concept. Lawrence, 105 Wn. App. at 688. Therefore, "a trial court's use of the concept in a custody determination would be an abuse of discretion." Lawrence, 105 Wn. App. at 688.

Here, the trial court repeatedly stated that Farrell was best suited to help the children have a positive relationship with both parents. Further, the permanent parenting plan found that residing primarily with Farrell would "provide the children with the best opportunity to foster and continue their relationship with both parents."[22] The trial court also explicitly based its permanent parenting plan decisions on its assessment of Farrell's willingness to maintain positive relationships, stating, "I just made [the] decision that I think that [Farrell] is the one that is more capable, more likely, more willing to do that."[23]

The trial court's repeated statements emphasizing Farrell's ability to foster relationships with both parents show that the friendly parent concept played a significant role in determining the permanent parenting plan and relocation request. This was an additional abuse of the trial court's discretion.

In light of the trial court's improper use of the friendly parent concept, premature application of the CRA, and lack of substantial evidence supporting the restrictions, we reverse and remand for a new trial.

---

[22] CP at 386.
[23] RP (Dec. 23, 2016) at 890.

Maintenance

Milosavljevic requested maintenance based on Farrell's substantially higher income and the negative impacts on his career and earning potential as a result of relocations for Farrell's employment. He argues that the trial court erred by denying his maintenance request without evidence of consideration of the relevant statutory factors. We agree.

The trial court can award maintenance to either party after consideration of all relevant statutory factors. In re Marriage of Zahm, 138 Wn.2d 213, 227, 978 P.2d 498 (1999). The statutory factors for maintenance include the financial resources of the party seeking maintenance, time necessary to obtain the skills for employment, the parties' standard of living during the marriage, duration of the marriage, the age, physical and emotional condition, and financial obligations of the seeking party, and the ability to pay of the other party. RCW 26.09.090(1)(a)-(f).

"Nothing in RCW 26.09.090 requires the trial court to make specific factual findings on each of the factors listed in RCW 26.09.090(1). The statute merely requires the court to consider the listed factors." In re Marriage of Mansour, 126 Wn. App. 1, 16, 106 P.3d 768 (2004). But "[a]n award that does not evidence a fair consideration of the statutory factors results from an abuse of discretion." In re Marriage of Spreen, 107 Wn. App. 341, 349, 28 P.3d 769 (2001). The appellate court reviews maintenance awards for abuse of discretion. Zahm, 138 Wn.2d at 226-27.

Here, the trial court did not provide factual findings, discussion, or analysis of the factors to support its denial of Milosavljevic's request for maintenance. The trial court merely marked the box on the order on findings and conclusions about a marriage, indicating that RCW 26.09.090 did not support an award of maintenance to either party. Thus, the trial court failed to demonstrate consideration of any of the statutory factors prior to denying Milosavljevic's request for maintenance. While RCW 26.09.090 does not require the trial court to make specific factual findings on each of the factors, the court must show fair consideration of the factors. See Spreen, 107 Wn. App. at 349. Therefore, the trial court's decision to deny maintenance was an abuse of discretion.

Farrell cites Mansour to support her claim that the court was not required to make findings of fact about the maintenance factors. 126 Wn. App. at 16. But Mansour states that the trial court need not provide findings for *each* factor. 126 Wn. App. at 16. Mansour does not stand for the idea that the trial court may make a decision on maintenance without demonstrating consideration of *any* statutory factors. In fact, the trial court in Mansour clearly considered several of the statutory factors, including the parties' postdissolution economic conditions and living expenses. 126 Wn. App. at 16. This differs significantly from the case at hand, where the trial court evinced no consideration of the factors. Therefore, Farrell's reliance on Mansour is misplaced.

By failing to provide evidence that it considered any of the statutory maintenance factors, the trial court abused its discretion in denying Milosavljevic's

19

maintenance request. We reverse the court's denial of maintenance and remand for consideration of the factors.

## Child Support

Milosavljevic claims that the trial court erred by setting his child support obligations based on erroneous income information. Farrell argues that Milosavljevic made contradictory statements about his income and that the trial court properly assessed his income based on these statements. The trial court employed an income figure unsupported by substantial evidence in the record. Therefore, we reverse the trial court's determination of Milosavljevic's child support obligation and remand for recalculation.

Child support is intended to be equitably apportioned between the parents. RCW 26.19.001. The trial court allocates support between the parents based on their shares of the combined monthly net income. RCW 26.19.080(1). Prior to assigning child support, the trial court must calculate the parents' monthly income. RCW 26.19.071; State ex rel. Taylor v. Dorsey, 81 Wn. App. 414, 423, 914 P.2d 773 (1996).

Child support orders are reviewed for abuse of discretion. In re Marriage of Schnurman, 178 Wn. App. 634, 638, 316 P.3d 514 (2013). "A trial court abuses its discretion if its decision rests on unreasonable or untenable grounds." Schnurman, 178 Wn. App. at 638.

"[T]he trial court's findings of fact must be supported by substantial evidence." In re Parentage of Goude, 152 Wn. App. 784, 790, 219 P.3d 717 (2009). "'Substantial evidence' is that which is sufficient to persuade a fair-minded

person of the declared premise." Goude, 152 Wn. App. at 790. This court will not substitute its judgment for that of the trial court if the record shows the court considered all relevant factors and the award is not unreasonable under the circumstances. In re Parentage of O.A.J., 190 Wn. App. 826, 830, 363 P.3d 1 (2015).

Here, the trial court's child support worksheet calculated Milosavljevic's total gross monthly income as $6,208.34. Milosavljevic contends that the trial court erroneously arrived at this total by including $1,000 in temporary maintenance, which he no longer receives. According to Milosavljevic, his gross monthly income is only $5,208.34.

The financial evidence in the record is contradictory. On the child support worksheet for the agreed temporary child support order that he prepared and signed, Milosavljevic listed a monthly wage of $6,208.34 and $1,000 in temporary monthly maintenance for a total gross monthly income of $7,208.34. This would support the trial court's use of $6,208.34 as his total gross monthly income, not including maintenance, for the purposes of the final child support order calculation.

In contrast, Milosavljevic's July 2016 financial declaration to the trial court lists monthly wage income as $5,208.34 plus $1,000 temporary maintenance for a total gross monthly income of $6,208.34. This monthly wage income of $5,208.34 is supported by additional evidence in the record. As of June 2016, Milosavljevic's yearly salary of $62,500 was confirmed by his employer. This breaks down to a monthly salary of $5,208.34. Biweekly paychecks submitted by Milosavljevic to the court show a gross income of $2,403.85.

Other evidence in the record supports additional income figures. Milosavljevic's 2015 W-2 form shows wages of $68,773.84, which corresponds to a monthly wage of $5,731.15. Milosavljevic testified to a salary of $61,000 per year, which breaks down to a monthly wage of $5,083.33.[24] He also told the court he had just received a $500 bonus two days before trial.

While the figures of Milosavljevic's monthly income vary, the majority of the evidence shows that Milosavljevic's income was below the $6,208.34 used by the trial court to calculate his final child support obligation. Only the temporary child support order worksheet lists $6,208.34 as Milosavljevic's gross monthly income. All other evidence supports a monthly wage between $5,731.15 and $5,208.34, without temporary maintenance. Furthermore, the $6,208.34 used by the trial court is exactly equal to Milosavljevic's claimed salary plus the prior maintenance award. This suggests that Milosavljevic made an error when he completed the child support worksheet for the agreed temporary child support order.

Given the evidence of Milosavljevic's income in the record, the trial court's factual finding of Milosavljevic's gross monthly income as $6,208.34 is not supported by substantial evidence. The trial court abused its discretion by relying on this figure to calculate Milosavljevic's child support payments. We reverse and remand for recalculation of Milosavljevic's final child support obligation.[25]

---

[24] Milosavljevic also testified to an annual income of $61,450.

[25] Milosavljevic also argues that his child support obligations, including his share of the additional expenses, exceed the 45 percent of net income limit established by RCW 26.19.065(1). In this case, the trial court did not provide calculations or estimates of the additional expenses and Milosavljevic has not provided any information on the extent of these costs. Without this information, we cannot assess whether Milosavljevic's total support obligations exceed 45 percent of his net income.

## Fees on Appeal

Milosavljevic requests fees on appeal under RCW 26.09.140. This court has discretion to order a party to pay fees and costs in a dissolution proceeding. RCW 26.09.140. In determining whether to award fees on appeal, this court balances the needs of one party against the other's ability to pay. In re Marriage of Lilly, 75 Wn. App. 715, 720, 880 P.2d 40 (1994). We must consider the parties' relative ability to pay and the arguable merit of the issues raised on appeal. Leslie v. Verhey, 90 Wn. App. 796, 807, 954 P.2d 330 (1998).

Milosavljevic has substantially prevailed on appeal, as we reverse and remand for a new trial. Furthermore, Farrell's net monthly income is approximately double Milosavljevic's net monthly income.[26] Farrell has not submitted an affidavit proving inability to pay. Therefore, we grant Milosavljevic's request for reasonable attorney fees and costs on appeal. See Mansour, 126 Wn. App. at 17.

Reversed and remanded for new trial.

Trickey, J

WE CONCUR:

---

[26] Evidence in the record shows Milosavljevic's monthly wage between $5,731.15 and $5,208.34. Milosavljevic subsequently submitted a financial declaration identifying his total net monthly expenses as $4,062.34 and his total monthly expenses and debt payments as $7,199.00. Farrell's previously identified net monthly income was $10,608.50.